**CONTINENTAL BASKETBALL ASSOCIATION, INC.,**
**Appellant–Defendant,**

v.

**ELLENSTEIN ENTERPRISES, INC., Appellee–Plaintiff.**

**No. 87A01–9312–CV–428.**

Court of Appeals of Indiana,
First District.

Sept. 19, 1994.

Rehearing Denied Nov. 17, 1994.

Leslie C. Shively, Noffsinger, Price, Bradley & Shively, Evansville, for appellant.

Marilyn R. Ratliff, Kahn, Dees, Donovan & Kahn, Evansville, for appellee.

ROBERTSON, Judge.

Continental Basketball Association, Inc. (CBA) appeals a partial summary judgment in favor of Ellenstein Enterprises, Inc. (Ellenstein) on Ellenstein's cross-complaint against CBA and the denial of CBA's motion for summary judgment on its counterclaim. We affirm the entry of partial summary judgment on Ellenstein's cross-complaint, as well as the denial of summary judgment on CBA's counterclaim.

CBA operates a professional basketball league and in the course of its business, sells what it calls "franchises" or memberships in the association. CBA membership is limited to sixteen active clubs. Each franchise authorizes its owner or owners to operate a club in a designated geographical area at least forty miles from any other club and grants the club exclusive rights to any city in which its team has played six or more home games during any season. Players are under contract with the CBA and part of the purchase price is attributable to the purchase of player contracts.

In May, 1984, Ellenstein entered into an agreement to purchase a franchise from CBA for a professional basketball club to be affiliated with CBA and to be located in Evansville, Indiana, by tendering a "Franchise Purchase Offer" to CBA upon a CBA form Ellenstein had modified. By the express terms of the offer, the "total purchase price for the franchise [was] Three Hundred Thousand Dollars ($300,000)." Ellenstein agreed to pay the fee in "assessments" or annual installments of $60,000 each and to abide by the terms of the CBA by-laws, CBA Operations Manual and "any rules and regulations."

In exchange, Ellenstein would share equally in the distribution of franchise fees from franchisees entering the CBA for the 1985–86 and later seasons; royalties, payments and profits from CBA Properties, Inc., CBA Entertainment, Inc. and all revenue derived from television, radio and broadcasting or any other source not specifically described; and, upon payment in full of the franchise fee, would receive a share of NBA revenue, which "includes all money or cash value of all services received from the National Basketball Association, NBA Properties, Inc., NBA Entertainment, Inc., NBA teams, including but not limited to money or services received for referee, player, coaching or front office development, computer programs or halftime promotional activities." Ellenstein also purchased rights to any player who plays or has played college basketball at Notre Dame,

Purdue University, and Indiana University not under contract to another team, and the opportunity to participate in a dispersal draft conducted by the other teams to obtain twelve players.

This litigation developed when members of the Evansville Thunder, the team operating under the franchise purchased by Ellenstein, sought an injunction to prevent the CBA and Ellenstein from excluding them from the CBA Western Division playoffs following the 1985–86 season. Ellenstein brought a four-count cross-claim against co-defendant CBA alleging franchise and common law fraud. CBA responded with a counterclaim against Ellenstein for amounts owed on the purchase agreement.

In their motions for summary judgment, both parties asked the trial court to determine with respect to Ellenstein's three statutory claims against CBA whether, upon the undisputed facts of the case, the contract between CBA and Ellenstein constituted a franchise as defined by the Indiana Franchises Act and the Indiana Deceptive Franchise Practices Act. The trial court resolved this question in favor of Ellenstein, finding that the agreement between the parties did constitute a franchise as defined by the Indiana Franchises Act.

CBA also argued that, as to the three statutory counts, Ellenstein had failed to specifically plead a claim of actionable fraud, setting forth the elements of common law fraud, and that the undisputed facts showed all payments required under the contract had not been made. The court denied CBA a summary judgment on its counterclaim, concluding that the undisputed facts showed a violation of the statutory provisions and that it could not enforce a contractual relationship created in violation of statute.

■ Summary judgment is appropriate only if the pleadings and evidence sanctioned by Ind.Trial Rule 56(C) show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Oelling v. Rao* (1992), Ind., 593 N.E.2d 189, 190. The reviewing court faces the same issues that were before the trial court and follows the same process. *Greathouse v. Armstrong* (1993), Ind., 616

N.E.2d 364, 366. Although the party appealing from the grant of summary judgment has the burden of persuading the court that the grant of summary judgment was erroneous, the reviewing court carefully scrutinizes the trial court's decision to assure that the party against whom summary judgment was entered was not improperly prevented from having its day in court. *Id.*

■ The burden is on the moving party to prove the non-existence of a genuine issue of material fact. *Rao,* 593 N.E.2d at 190. Any doubt about the existence of a factual issue should be resolved against the movant, with all properly asserted facts and reasonable inferences construed in favor of the nonmovant. *Id.* Even if the facts are undisputed, summary judgment is not proper if those undisputed facts "give rise to conflicting inferences which would alter the outcome." *Bochnowski v. Peoples Federal Savings & Loan Ass'n* (1991), Ind., 571 N.E.2d 282, 285.

In 1975 and 1976, the Indiana General Assembly enacted two pieces of legislation regulating trade in a particular kind of property right or interest which it calls a "franchise" in an effort to prevent fraud and to assure that investors are afforded a reasonable opportunity to exercise independent judgment in franchise transactions. *See Enservco, Inc. v. Indiana Securities Division* (1993), Ind., 623 N.E.2d 416, 425. Indiana Code 23–2–2.5 governs the offer and sale of franchises or interests in franchises and contains registration and disclosure provisions as well as a general antifraud provision akin to federal securities rule 10b–5, 17 C.F.R. § 240.10b–5 (1992), *Enservco,* 623 N.E.2d at 421–2, while I.C. 23–2–2.7 seeks to protect franchisees by restricting the types of clauses that can be written into franchise agreements, by restricting the acts and practices of franchisors, and by establishing restrictions on the ability of the franchisor to terminate a franchise agreement. *Implement Service, Inc. v. Tecumseh Products Co.* (S.D.Ind., 1989), 726 F.Supp. 1171, 1176.

To fall within the scope of these enactments, a person must offer or sell a "franchise" as defined by the legislature. We are bound by that definition, even if it conflicts

with the common meaning of the word. *Consolidation Coal Co. v. Indiana Department of State Revenue* (1991), Ind., 583 N.E.2d 1199, 1201. *Accord Wright–Moore Corp. v. Ricoh Corp.* (7th Cir.1990), 908 F.2d 128, 134 (It is for Indiana legislature to decide what "hallmarks" of franchise are and it has done so through its statutory enactment). For purposes of both chapters,

"[f]ranchise" means a contract by which: (1) a franchisee is granted the right to engage in the business of dispensing goods or services, under a marketing plan or system prescribed in substantial part by a franchisor;

(2) the operation of the franchisee's business pursuant to such a plan is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising, or other commercial symbol designating the franchisor or its affiliate; and

(3) the person granted the right to engage in this business is required to pay a franchise fee.

I.C. 23–2–2.5–1(a). *See also,* I.C. 23–2–2.7–5. Unless an exemption or exception applies, I.C. 23–2–2.5 and 2.7 govern all agreements occurring after July 1, 1976, which meet the criteria set forth in I.C. 23–2–2.5–1(a) and either involve an Indiana offeree or franchisee or contemplate the operation of a franchise business in the state of Indiana, I.C. 23–2–2.5–2; I.C. 23–2–2.7–1; I.C. 23–2–2.7–2, regardless of the legal terminology in which the transaction is clothed.

Thus, we consider whether the agreement between CBA and Ellenstein meets the indicia of a franchise established by the Indiana General Assembly. The CBA is an association of member clubs in the business of providing entertainment to the public in the form of professional basketball games between clubs. Entertainment is considered a service in connection with the law of service marks. *Dallas Cowboys Cheerleaders v. Pussycat Cinema, Ltd.* (S.D.N.Y. 1979), 467 F.Supp. 366, 373, *affirmed,* 604 F.2d 200. In exchange for its investment, Ellenstein purchased the right to provide CBA professional basketball entertainment in the Evansville, Indiana area. According

to the designated evidentiary materials, Ellenstein bought the right to operate a team in the league, entitling it to an equal share of the revenue generated by the league for its teams, once it had fully paid its franchise fee, as well as whatever profits it made by engaging in the business of operating a team.

Ellenstein agreed to comply with the CBA by-laws, a 100–150 page "Operations Manual" and the CBA's rules and regulations. These documents controlled the transfer of title to an interest in the league, and nearly every other aspect of the selling of CBA professional basketball entertainment, including the acquisition and signing of coaches and players; the responsibilities of owners, business managers, general managers, coaches and players; personnel rules and official rules for play; playoff procedures and awards; procedures for the provision of concessions and souvenir sales; procedures for trainers; public relations; equipment suppliers; ticket and box office procedures; score-keeping and timing; public address announcements; security; and mascots and cheerleaders. Thus, the undisputed evidence establishes that by virtue of the May 19, 1984 contract between the parties, CBA granted Ellenstein the right to engage in the business of dispensing CBA professional basketball services under a marketing plan or system prescribed in substantial part by CBA.

Likewise, there appears to be no dispute that in May of 1984, Ellenstein purchased from the CBA the right to substantially associate the team or club it formed with the CBA. Under the terms of the agreement between Ellenstein and the CBA, the extent to which Ellenstein actually used the CBA logo or chose to visually identify itself with the CBA was left to its own discretion. But, the entertainment produced by games between CBA clubs plainly constituted the distribution of services covered by CBA's trade name. And, CBA owned and controlled all national advertising sponsorship opportunities for the games of its clubs, providing a CBA game-of-the-week and exposure in the NBA's publications. The undisputed evidence supports a finding the business sold to Ellenstein would be substantially associated with CBA's service mark, trade name and

advertising. *Cf. Kim v. Servosnax, Inc.* (1992), 10 Cal.App.4th 1346, 13 Cal.Rptr.2d 422 (Specific grant of authority to use franchisor's name would be conclusive evidence of substantial association under virtually identical California statute).

CBA argues that the payment of $300,000 to obtain the team and CBA membership was simply a cost of doing business because the funds were used to offset the league's operating expenses. The record reflects that the CBA had no capitalization of its own and very little in assets, consisting of some computers and secondhand furniture. As a practical matter, the money received from franchise fees was shared equally by the clubs entitled to a share and used to offset each club's share of league expenses which would ordinarily be paid by dues, but the by-laws and Operations Manual unequivocally state that any revenue received by the CBA for its own benefit or the benefit of its clubs is the property of the CBA and not the clubs.

> For purposes of this case,
>
> "[f]ranchise fee" means any fee that a franchisee is required to pay directly or indirectly for the right to conduct a business to sell, resell, or distribute goods, services or franchises under a contract agreement, including, but not limited to, any such payment for goods or services....

I.C. 23–2–2.5–1(i). In the absence of Indiana authority interpreting this criterion, the Seventh Circuit has reasoned that the requirement was imposed by the legislature to protect franchisees who will have unequal bargaining power once they have made an unrecoverable firm-specific investment in the franchisor. *Wright–Moore Corp. v. Ricoh Corp.*, 908 F.2d at 135. The statutes were designed to ensure fair dealing between the parties. *Id.* at 137. Where there is no investment, there is no fear of inequality in bargaining power. Hence, the statute defines a franchise fee as a fee paid for the right to do business, not as a fee paid during the course of business. Under the federal cases, the evidence must therefore show the payment of an unrecoverable investment in a CBA distributorship.

The designated evidence establishes that in exchange for the right to engage in the business of dispensing CBA professional basketball services, Ellenstein agreed to pay $300,000 in five annual installments. Part of the $300,000 payment could be reported for tax purposes as the purchase price for the services of twelve players under contract with the other clubs; but, the remainder constituted a direct payment for the right to conduct the CBA professional basketball business in Evansville, Indiana. No portion of the fee was recoverable from the CBA by Ellenstein. Ellenstein would be entitled to a share of the franchise fees paid by new franchisees for the purchase of an expansion team in the 1985–86 and subsequent seasons but only to the extent the distribution exceeded CBA's operating expenses. In other words, the fee provided the CBA with working capital. *Cf.* Minn.Stat.Ann. § 80C.01, subd. 9 (West 1986); S.D. Codified Laws Ann. § 37–5A–3 (1994) and Wash.Rev.Code Ann. § 19.100.010(12) (West Supp.1994) (expressly incorporating lump sum or installment payments of an initial capital investment fee and any payment for the mandatory purchase of goods or services or any payment for goods or services available only from the franchisor in definition of franchise fee).

At the same time, the CBA retained control over the sale of 10% or more of any CBA franchise by retaining the right to approval of the sale. If a club were sold, it must operate within forty miles of the corporate city limits of the franchise city.

Any franchisee could offer to sell its franchise back to the league at the time the sale of a new expansion franchise would be contemplated. However, the CBA dictated the terms of its buyback. The sale price of the existing franchise could not exceed 50% of the sale of the new expansion franchise which triggered the offer, and would be the lowest offer of all clubs submitting bids. The purchase price would be made in five equal annual installments with various deductions made from each payment. The franchisee would sell the franchise, club name, logo, uniforms, warm-ups, accounts receivable from the CBA, CBA Properties and CBA Entertainment, scoreboards, collapsible rims and any other items provided by the CBA

and requested by the commissioner. If the offer were accepted, the franchisee would agree to release to the CBA all its right, title and interest, both real and intangible, to its CBA franchise, club name and logo, would agree not to operate, manage or promote another professional basketball club in North America for three years and would agree to release and waive all claims against the CBA.

A CBA club could also withdraw from membership by giving notice, making full payment of all dues owing to the CBA and other clubs, and assigning the contracts of its players, the lease held on its playing floor, and all rights the clubs may have or claim to have to the funds and property rights of the CBA. If a team were to attempt to withdraw from the CBA without its unanimous consent, all right, title, and interest in the club's franchise immediately becomes the CBA's property, all player contracts become CBA property and the club must pay the CBA liquidated damages in the amount of $250,000. This evidence shows the inequality in bargaining power existing between the parties to the franchise and that payment of the franchise fee was in fact payment for the right to operate a team associated with the CBA.

CBA seeks to avoid the effect of the franchise statutes by characterizing its business relationship with Ellenstein as a joint venture and insisting that the legislature intended joint ventures to be outside the purview of this legislation. CBA argues that the statutes presume that the franchisee and franchisor are wholly independent business entities. CBA reasons that because the federal courts have recognized that professional sports leagues have some of the characteristics of joint ventures, *see, e.g. Smith v. Pro Football, Inc.* (D.C.Cir.1978), 593 F.2d 1173; *Mackey v. National Football League* (8th Cir.1976), 543 F.2d 606, *cert. denied,* 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59, and as in this case, the purchaser actually becomes an owner of or investor in the seller, the legislature did not intend the chapters governing franchises to apply.

The existence of various sections of the Franchises Act evinces that the General Assembly considered the circumstances which warrant exemption from the Act's disclosure, registration and supervisory requirements and made provision expressly. For example, the legislature relieved certain franchisors, who by reason of net worth and number of franchisees, apparently pose minimal risk to investors, from the requirements of sections nine through twenty-five of the Act and imposed a separate disclosure requirement upon those transactions. I.C. 23–2–2.5–3. The legislature also exempted the sale of a franchise by a franchisee not affiliated with a franchisor "for his own account" "if the sale is not affected by or through a franchisor." I.C. 23–2–2.5–4. CBA is not able to claim entitlement to either of these express exemptions.

But, the legislature also recognized that there would be circumstances in which the imposition of the Act's disclosure, registration and supervisory requirements would not be in the public interest. I.C. 23–2–2.5–5. The legislature delegated the authority for making such a determination to the Indiana Securities Commissioner, not the courts. The courts do not interpret or create exceptions to statutes which are clear and unambiguous on their face. *In Re the Matter of Grissom* (1992), Ind., 587 N.E.2d 114, 116. *Cf. Eastman v. State* (1887), 109 Ind. 278, 283, 10 N.E. 97 (Statute regulating the practice of medicine).

CBA did not seek exemption under I.C. 23–2–2.5–5 nor can we agree that the franchise sale between CBA and Ellenstein should fall outside the scope of the Act "as not being comprehended within the purposes of this law" or "not necessary or appropriate in the public interest or for the protection of investors." The legislature's definition of franchise envisions that the franchisor will part with something of its essence, that is, association with its business identity, in exchange for the franchisee's direct or indirect investment. See C. Rosenfield, The Law of Franchising § 11 at 14 (1970). The franchisee buys participation in the business of the franchisor; the purchase of a franchise is tantamount to the purchase of a share in the franchisor, *id.,* § 212 at 283, and in this respect, the franchise begins to resemble a security. Where, as here, the franchisor is

inadequately capitalized and is using income from the sale of franchises to fund itself, the franchisee is in effect contributing equity capital to the franchisor. Under these circumstances, the risks are akin to those posed by an investment in securities and are plainly intended to be the subject of the Act's disclosure provisions, whether or not the franchisor and franchisee assume a new legal identity once the transaction is consummated.

CBA maintains that the trial court erred in its determination that the purchase and sale of participation in CBA was subject to the Indiana Deceptive Franchise Practices Act. Under this section of its brief, CBA reiterates its argument that the transaction between it and Ellenstein was not the sale of a franchise. It also argues that a private cause of action brought pursuant to I.C. 23–2–2.7–4 can only be predicated upon a violation of I.C. 23–2–2.7–1 or I.C. 23–2–2.7–2, not upon I.C. 23–2–2.7–3. Ellenstein alleges in count II of its cross-claim that CBA unilaterally terminated Ellenstein's franchise without good cause and in violation of I.C. 23–2–2.7–1 and failed to give notice as required by I.C. 23–2–2.7–3.

■ CBA did not make this argument in its memorandum in support of its motion for summary judgment on Ellenstein's cross-claim and its counterclaim. But, even if it had, the argument does not amount to a defense to the partial summary judgment requested by Ellenstein as a matter of law. Indiana Code 23–2–2.7–1(7) makes it unlawful for any franchise agreement entered into between any franchisor or franchisee who is either a resident of Indiana or a nonresident operating a franchise in Indiana to contain a provision which permits unilateral termination of the franchise if such termination is without good cause or in bad faith. At least a portion of Ellenstein's claim in count II alleges the inclusion in the franchise agreement of a provision prohibited by I.C. 23–2–2.7–1. Indiana Code 23–2–2.7–4 therefore is an appropriate vehicle for bringing at least a portion of the claim in count II.

CBA argues that the trial court found as a matter of law that it was liable to Ellenstein pursuant to I.C. 23–2–2.7. CBA refers us to the trial court's conclusions numbered 11 and 12. Paragraph 11 contains the trial court's conclusion that there is no genuine issue of material fact as to the applicability of the "Uniform Franchise Act of Indiana" or the Indiana Deceptive Franchise Practices Act and grants Ellenstein a judgment as a matter of law on that issue. Paragraph 12 denies CBA relief on its counterclaim, stating that the court had found CBA to be in violation of the "Acts" in connection with its offer and sale of the franchise to Ellenstein and that the court could not enforce a contract created in violation of statute and for the benefit of the party committing the violation of statute. We find no express determination of liability in any of the court's findings or conclusions.

In support of its conclusion in paragraph 12, the trial court found as a fact that the CBA had acknowledged it did not fall within any of the statutory exceptions to I.C. 23–2–2.5–3, that it had not been granted an exemption and did not register or provide the disclosure statement required by those statutes. Our review of the record reveals no dispute on this question: CBA did not register or make the disclosures required by I.C. 23–2–2.5–10 and 13.

Indiana Code 23–2–2.5–9 provides that "[n]o person may offer or sell any franchise unless the franchise is registered under this chapter or is exempt and without first providing to the prospective franchisee at least ten days prior to the franchisee's execution of a binding franchise or receipt by the franchisor of any consideration, whichever occurs first, a disclosure statement together with a copy of all proposed contracts relating to the sale of a franchise." A person who knowingly violates chapter 2.5 commits a class C felony. I.C. 23–2–2.5–37. Registration and disclosure are thus preconditions to the offer or sale of a franchise in Indiana.

■ A contract made in violation of a statute is void. *First Federal Savings Bank v. Galvin* (1993), Ind.App., 616 N.E.2d 1048, 1052, *trans. denied; Hoffman v. Dunn* (1986), Ind.App., 496 N.E.2d 818 (holding exclusive listing contract void because not signed by licensed broker). Where a statute forbids carrying on a business without first

procuring a license, paying a tax, and complying with prescribed tests, inspection, registration or the like, contracts made by persons in carrying on such business are void, though the statute contains no express provision to that effect. *Mullikin v. Davis* (1876), 53 Ind. 206 (Recovery denied on contract for sale of liquor to one without license to lawfully retail); *Beecher v. Peru Trust Co.* (1912), 49 Ind.App. 184, 187, 97 N.E. 23, 25 (cited with approval in *Faust v. Design Consultants, Inc.* (1989), Ind.App., 542 N.E.2d 1383, 1384). If the statute prescribes what shall be done before the right to do a certain thing, or carry on a certain business, is granted, and prohibits such business under penalty, the fact that the violation of the act is made a crime implies a prohibition, and gives to it the same effect it would have if the statute expressly declared void contracts made in carrying on such business. *Beecher,* 49 Ind.App. at 187, 97 N.E. 23. The party who seeks to enforce a right dependent upon such law has the burden of showing compliance therewith and may not rely upon the presumption that the requirements of the law have been satisfied. *Bright National Bank v. Hartman* (1915), 61 Ind.App. 440, 448, 109 N.E. 846, 849.

The undisputed evidence established that CBA did not comply with the requirements of I.C. 23–2–2.5 and that the failure to comply with the chapter constitutes a felony. The trial court correctly determined that under these circumstances the contract of sale was void and unenforceable. The trial court correctly denied CBA summary judgment on its counterclaim. *Cf. Hiltpold v. T–Shirts Plus, Inc.* (1980), 98 Wis.2d 711, 298 N.W.2d 217, 220 (Franchisor who illegally sells or offers to sell a franchise not allowed to assert counterclaim under void franchise agreement). The partial summary judgment in favor of Ellenstein is affirmed, leaving questions of liability and damages to be tried.

Judgment affirmed.

BAKER and HOFFMAN, JJ., concur.