**CONTINENTAL BASKETBALL
ASSOCIATION, INC.,
Appellant,**

v.

**ELLENSTEIN ENTERPRISES,
INC., Appellee.**

No. 87S01–9505–CV–519.

Supreme Court of Indiana.

June 20, 1996.

James H. Ham, III, David K. Herzog, David A. Given, Baker & Daniels, Indianapolis, for appellant.

Marilyn R. Ratliff, Kahn, Dees, Donovan & Kahn, Evansville, for appellee.

### ON PETITION TO TRANSFER

SULLIVAN, Justice.

Franchising is a major method of doing business in the United States today, with auto dealerships, gas stations, fast food restaurants, and a myriad of other franchised enterprises accounting for perhaps one-third of the economy's retail sales.[1] The close working relationship of a franchisor and its franchisees has given rise to a number of interesting legal problems.[2] Arising under the Indiana Franchise Act[3] and the Indiana Deceptive Franchise Practices Act,[4] this case involves a dispute between a professional basketball franchise and the league of which it was a member.

### Background

The Continental Basketball Association ("CBA") operates a professional basketball league, and in the course of its business sells what it calls "franchises." In 1984, Ellenstein Enterprises, Inc. ("Ellenstein"), entered into a contract entitled "Franchise Purchase Offer" with CBA. Under this

---

1. Thomas M. Pitegoff, *Franchise Relationship Laws: A Minefield for Franchisors*, 45 Bus.L. 289, 291 (1989), *quoting* A. Kostecka, Franchising in the Economy, 1986–1988, 14 (U.S. Dep't of Commerce 1988). In response to perceived abuses by franchisors, a number of states including Indiana enacted franchise registration and disclosure laws and franchise relationship laws during the 1970s. *Id.* At the end of the 1970s, the Federal Trade Commission issued a rule on franchising requiring presale disclosure. Little new state franchising legislation has been enacted since the adoption of the FTC rule. *Id.*

2. *See, e.g.*, Robert T. Joseph, *Do Franchisors Owe A Duty of Competence?*, 46 Bus.L. 471 (1991); Lee A. Rau, *Implied Obligations in Franchising: Beyond Terminations*, 47 Bus.L. 1053 (1992).

3. Ind.Code § § 23–2–2.5–1—23–2–2.5–51 (1989).

4. Ind.Code § § 23–2–2.7–1—23–2–2.7–7 (1989).

agreement, Ellenstein purchased a "franchise" from CBA for the sum of $300,000. The franchise was for a CBA-affiliated professional basketball team to be located in Evansville, Indiana (the "Evansville Thunder"), that would participate in professional basketball games with teams formed by other franchise owners. In addition, under the contract, Ellenstein was granted the right to use the CBA logo and have access to the marketing system created by the CBA. Ellenstein also agreed to abide by the terms of CBA by-laws, its Operations Manual, and any other CBA rules and regulations.

This case began several years back when the Thunder sought an injunction to prevent the CBA from conducting its playoffs without including the Thunder. The litigation evolved into a dispute between Ellenstein and the CBA, with the CBA seeking amounts due from Ellenstein under the franchise agreement and Ellenstein seeking damages from the CBA under the Indiana Franchise Disclosure Act (the "Disclosure Act") and the Indiana Deceptive Franchise Practices Act (the "Practices Act") (together, the "Franchise Acts"). Specifically, Ellenstein claimed that it suffered damages due to:

(i) CBA's "fail[ure] to comply with the disclosure requirements imposed by the" Disclosure Act (the "Disclosure Claim");

(ii) Ellenstein's reliance on "false, misleading and/or incomplete information provided by CBA in deciding to purchase the franchise" (the "Franchise Fraud Claim"); and

(iii) CBA's termination of Ellenstein's franchise in violation of the Practices Act (the "Termination Claim").

This interlocutory appeal was taken by the CBA after the trial court ruled (i) that Ellenstein's purchase of a CBA franchise was subject to the Franchise Acts, thereby permitting Ellenstein's Disclosure, Franchise Fraud, and Termination Claims to go forward; and (ii) that because the CBA had not complied with the Franchise Acts, the CBA could not enforce the franchise agreement against Ellenstein. The Court of Appeals affirmed. *Continental Basketball, Inc. v. Ellenstein Enterprises, Inc.*, 640 N.E.2d 705, 712 (Ind.Ct.App.1994).

## Discussion

### I

Ellenstein asserts, and the trial court and Court of Appeals held, that the contract between Ellenstein and CBA constituted a "franchise" under the Franchise Acts and therefore is subject to their mandates.

■ The Franchise Acts govern transactions in which a person offers or sells "franchises" as defined by the Acts. Both Acts define "franchise" as a contract by which:

(i) a franchisee is granted the right to engage in the business of dispensing goods or services, under a marketing plan or system prescribed in substantial part by a franchisor;

(ii) the operation of the franchisee's business pursuant to such a plan is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising, or other commercial symbol designating the franchisor or its affiliate; and

(iii) the person granted the right to engage in this business is required to pay a franchise fee.

Ind.Code § 23–2–2.5–1(a) and Ind.Code § 23–2–2.7–5.

The Disclosure Act provides statutory exclusions from its coverage and additional exemptions from its coverage upon approval of an application by the Indiana securities commissioner. Ind.Code §§ 23–2–2.5–2 through 5. However, the agreement does not fall into any of the statutory exclusions and CBA did not apply for an exemption under the Disclosure Act.

The Court of Appeals concluded that the following facts supported the trial court's conclusion that the agreement was governed by the Franchise Acts: (i) "Ellenstein bought the right to operate a team in the league, entitling it to an equal share of the revenue generated by the league," *Continental Basketball, Inc.*, 640 N.E.2d at 708; (ii) Ellenstein agreed to comply with CBA requirements, *id.*; (iii) under the agreement, Ellenstein purchased the right to associate the Evansville Thunder with the CBA, *id.*;

and (iv) the Evansville Thunder "would be substantially associated with CBA's service mark, trade name, and advertising," *id.* at "708–9. We add that the fact that the CBA entitled the contract a "Franchise Purchase Offer" bolsters Ellenstein's argument that it purchased a franchise. In light of these factors, we agree with the Court of Appeals that the contract constituted a franchise agreement under the Franchise Acts and adopt and incorporate its opinion with respect thereto. Ind.Appellate Rule 11(B)(3).

## II

Having found that a franchise exists within the meaning of the Franchise Acts, we consider the extent to which Ellenstein has a cause of action against the CBA on Ellenstein's Disclosure, Franchise Fraud, and Termination Claims under those statutes.

■ *Disclosure Claim.* In *Hardee's of Maumelle, Arkansas, Inc. v. Hardee's Food Systems, Inc.*, 31 F.3d 573, 577 (7th Cir. 1994), plaintiff franchisee sought damages from franchisor for, *inter alia*, violating the disclosure provisions of the Disclosure Act. Holding that the statute does not provide a private right of action for violations of its disclosure provisions, the Seventh Circuit affirmed summary judgment for the franchisor on this issue. In reaching this decision, the Seventh Circuit predicted that, if faced with this issue, our court would likely follow the holdings of the Indiana Court of Appeals that the Disclosure Act creates a private right of action only for acts which constitute fraud, deceit or misrepresentation. *Id.* at 577, *citing Moll v. South Central Solar Systems*, 419 N.E.2d 154, 162 (Ind.Ct.App.1981) and *Master Abrasives Corp. v. Williams*, 469 N.E.2d 1196, 1200 (Ind.Ct.App.1984), *both disapproved in part on other grounds, Enservco, Inc. v. Indiana Securities Div.*, 623 N.E.2d 416, 425 (Ind.1993).

We agree. As Judge Ratliff noted in *Moll,* the Disclosure Act is structured in such a way as to provide both public and private enforcement of certain of its provisions. Broad enforcement authority is conferred on the state securities commissioner and the prosecutor to combat violations of any provisions of the statute. *See, e.g.,* Ind.Code §§ 23–2–2.5–32 (injunctive and other relief); 23–2–2.5–34 (cease and desist orders); 23–2–2.5–35 (criminal prosecution). But enforcement authority conferred on private parties is limited to combating violations of the antifraud provision of the Disclosure Act,[5] which paraphrases Rule 10b–5 under the Securities Exchange Act of 1934.[6] A private right of action "arises for failure to comply with the [Disclosure Act] only upon allegations of facts which would support an inference of fraud, deceit, or misrepresentation." *Id.,* 419 N.E.2d at 162, *citing* Gerald L. Bepko, *Survey of Recent Developments in Indiana Law–Contracts and Commercial Law,* 9 Ind. L.Rev. 132, 152 (1975). Ellenstein may not maintain its Disclosure Claim as it seeks private enforcement for violations of the disclosure provisions of the Disclosure Act.

■ *Franchise Fraud Claim.* In *Enservco, Inc. v. Indiana Securities Div.*, we disapproved *Moll* and *Master Abrasives* to the extent that those cases required proof of culpability or scienter as an element of franchise fraud. 623 N.E.2d at 425. However, even though the elements of franchise fraud are not as extensive as the elements of common law fraud, the plaintiff in a franchise fraud action must nevertheless plead the facts and circumstances alleged to constitute fraud, deceit or misrepresentation with at least the same degree of particularity and detail as would be necessary to maintain an action for common law fraud. *See Moll,* 419 N.E.2d at 162–63. That is, the mandate of Ind.Trial Rule 9(B) that "[i]n all averments of fraud, or mistake, the circumstances constituting fraud or mistake shall be specifical-

---

**5.** "It is unlawful for any person in connection with the offer, sale or purchase of any franchise, or in any filing made with the commissioner, directly or indirectly: (1) to employ any device, scheme or artifice to defraud; (2) to make any untrue statements of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of circum-

stances under which they are made, not misleading; or (3) to engage in any act which operates or would operate as a fraud or deceit upon any person." Ind.Code § 23–2–2.5–27.

**6.** 17 C.F.R. § 240.10b–5 (1995).

ly averred," is equally applicable to common law and statutory fraud claims.[7]

■ We now turn to the question of whether Ellenstein sufficiently pled franchise fraud here. In *Dutton v. International Harvester Co.*, the Court of Appeals helped define the particularity needed to satisfy T.R. 9(B) when it said: "The circumstances constituting fraud include 'the time, the place, the substance of the false representations, the facts misrepresented, and the identification of what was procured by fraud.' *Wilson v. Palmer* (1983), Ind.App., 452 N.E.2d 426, 428; *quoting Cunningham v. Associates Capital Services Corp.* (1981), Ind.App., 421 N.E.2d 681, 683." *Dutton v. International Harvester Co.*, 504 N.E.2d 313, 318 (Ind.Ct. App.1987), *trans. denied.*

Additional guidance is provided in *Moll*, where the court cited to Professor Harvey's *Indiana Practice:*

> The circumstances constituting fraud or mistake must be stated with particularity. In general the circumstances of fraud would be the time, the place, the substance of the false representations, the facts misrepresented, and the identification of what was procured by the fraud. *U.S. v. Hartmann*, D.C.Pa.1942, 2 F.R.D. 477. In order to state a claim the pleader must allege the elements of fraud.... However, it is not proper to plead detailed evidentiary matter. Rule 9(B) must be read with Rule 8 requiring short and concise statements of claim [sic]. *U.S. v. Schuchhardt*, D.C.Ind.1943, 48 F.Supp. 876. On the other hand, where the facts showing fraud are set out in detail, the complaint will be good as for fraud even though the word 'fraud' is not used thereon.

*Moll,* 419 N.E.2d at 162–63, quoting 1 W. Harvey, *Indiana Practice* § 9.2 at 542 (1969).

■ Here, Ellenstein, in its cross claim, asserted with respect to its Franchise Fraud allegation:

> 2.... [I]n the process of soliciting Ellenstein to purchase the franchise, [CBA] otherwise failed to provide Ellenstein with sufficient, accurate information and CBA misstated and/or omitted material facts concerning, among other things, the operation and potential profitability of the franchise.
>
> 3. Ellenstein relied upon the false, misleading and/or incomplete information provided by CBA in deciding to purchase the franchise and made further expenditures in reliance upon this false, misleading and/or incomplete information, and, as a result, has been damaged.

After carefully reviewing Ellenstein's cross claim, we conclude that this language does not satisfy the special pleading requirements for fraud. There is a clear failure to identify the substance of the so-called fraudulent statements. Ellenstein instead offers a very general statement alluding to some fraudulent statements "*concerning,* among other things, the operation and the potential profitability of the franchise" (emphasis added)— with absolutely no indication whatsoever of what those statements were and where or when they were made. Although we do not expect a literal recital of the alleged fraudulent statements, a fairly specific description of the content of the misrepresentations is necessary. *See Graue Mill Dev. Corp. v. Colonial Bank & Trust Co. of Chicago,* 927 F.2d 988, 993 (7th Cir.1991) (Rule 9(B) requires pleading the "specific content of the false representations"). To allow general or vague assertions of fraud would frustrate such purposes of the rule as providing adequate notice to the alleged perpetrator and preventing potentially damaging accusations without some concrete description of what is being alleged. *Bankers Trust Co. v. Old*

7. This is also the rule in the federal courts where Fed.R.Civ.P. 9(B) provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." *See Design Time v. Synthetic Diamond Technology,* 674 F.Supp. 1564 (N.D.Ind.1987) (complaint did not sufficiently allege fraud under Securities Exchange Act Rule 10b–5 because, among other reasons, the actual content of the representations were too vaguely alleged); *Zaro Licensing, Inc. v. Cinmar, Inc.,* 779 F.Supp. 276, 280 (S.D.N.Y.1991) ("It is also well settled that where the predicate crimes of a RICO claim sound in fraud, as here, the pleading of those predicate acts must satisfy the particularity requirements of Rule 9(b).")

*Republic Ins. Co.*, 959 F.2d 677, 683 (7th Cir.1992).

We find Ellenstein's pleading does not specifically include the substance of the fraudulent statements or the facts misrepresented and therefore conclude that it does not satisfy the pleading requirements of T.R. 9(B). Ellenstein may not maintain its Franchise Fraud Claim.

■ *Termination Claim.* The Practices Act prohibits any provision in franchise agreements that provides for unilateral termination of a franchise without good cause or in bad faith, Ind.Code § 23–2–2.7–1(7), or that permits a franchisor to fail to renew a franchise without good cause or in bad faith, Ind.Code § 23–2–2.7–1(8).[8] Section 23–2–2.7–4 of the Practices Act provides a cause of action for "[a]ny franchisee who is a party to a franchise agreement entered into or renewed after July 1, 1976 which contains any provision set forth in Section 1 of this chapter or who is injured by an unfair act or practice set forth in Section 2 of this chapter...." Therefore, the Practices Act expressly provides for a cause of action against the franchisor in cases where a franchise agreement contains a provision prohibited by the Practices Act, and/or where the franchise agreement is terminated without good cause or not renewed without good cause. The Practices Act further requires at least ninety days notice for termination of a franchise or election not to renew a franchise, unless the franchise agreement otherwise provides. Ind.Code § 23–2–2.7–3. If the franchise agreement provides that the agreement may be terminated at any time, failure to give ninety day notice before termination is not in violation of the Practices Act. *Snihurowycz v. AAMCO Transmissions, Inc.*, 418 N.E.2d 1190 (Ind.Ct.App.1981).

The Termination Claim alleges that CBA unilaterally terminated Ellenstein's contract without good cause and further failed to give notice of termination. Because of the procedural posture of this case, the trial court has not addressed this issue and we decline to do so here. While the Practices Act provides that "[g]ood cause ... includes any material violation of the franchise agreement," Ind. Code § 23–2–2.7–1(7), suggesting that a determination of good cause could, in appropriate circumstances be made as a matter of law, we note that more often it seems to be a question of fact. *See Frieburg Farm Equipment, Inc. v. Van Dale, Inc.*, 978 F.2d 395, 401 (7th Cir.1992) (whether "good cause" for termination under Wisconsin Fair Dealership Law exists is generally a question best determined by the jury); *Freedman Truck Center, Inc. v. General Motors Corp.*, 784 F.Supp. 167 (D.N.J.1992) (summary judgment inappropriate for question of whether franchisor terminated franchise agreement without good cause in violation of New Jersey Franchise Practice Act). Because the parties have not briefed the issue of whether CBA had good cause to terminate the franchise agreement and because this issue could turn on a factual determination, we remand the Termination Claim to the trial court.

### III

The trial court held, and the Court of Appeals agreed, that because the CBA did not comply with the registration and disclosure requirements of the Disclosure Act, the franchise agreement was void. If that be so, the CBA would be precluded from recovering any amounts otherwise due it under the franchise agreement.

■ In our recent decision in *Fresh Cut, Inc. v. Fazli*, 650 N.E.2d 1126 (Ind. 1995), we emphasized the very strong presumption of enforceability of contracts that represent the freely bargained agreement of the parties. However, we acknowledged that courts have refused to enforce private agreements on public policy grounds in three types of situations: (i) agreements that contravene statute; (ii) agreements that clearly tend to injure the public in some way; and (iii) agreements that are otherwise contrary to the declared public policy of Indiana. *Id.*, 650 N.E.2d at 1130. In *Fresh Cut*, the

---

**8.** Indiana does not stand alone in its effort to protect franchisees from arbitrary termination. At least sixteen other states have enacted similar statutes governing termination of franchise agreements. *See* Lee A. Rau, *Implied Obligations in Franchising: Beyond Terminations*, 47 The Business Lawyer 1053, 1053 n. 3 (May 1992).

agreement at issue fell into the third category and we declared that the proper method of determining enforceability in such circumstances required balancing certain relevant considerations.[9] *Id.* In the case before us, Ellenstein argues that the franchise agreement goes beyond mere contravention of declared public policy and actually contravenes statute. Because of this, Ellenstein argues, we should not apply the balancing test used in *Fresh Cut* but declare the franchise agreement void.

As a general matter, we agree that where a contract goes beyond mere contravention of declared public policy and actually contravenes a statute, the court's responsibility is to declare the contract void rather than apply the balancing test. But crucial to that determination is deciding whether a contract actually contravenes statute. And because we value the freedom to contract so highly, we will not find that a contract contravenes a statute unless the language of the implicated statute is clear and unambiguous that the legislature intended that the courts not be available for either party to enforce a bargain made in violation thereof.

The legislature has made clear and unambiguous its intent that certain types of contracts not be enforced by declaring them "void" or "unenforceable" in so many words.[10] On the other hand, the statutory provision at issue here does not go so far as to declare this type of agreement "void" or "unenforceable." Rather, it provides that "[n]o person may offer or sell any franchise" unless (i) the franchise is registered under the act or is exempt from the registration provisions of the act and (ii) a disclosure statement and copies of all proposed contracts relating to the sale of a franchise are provided to the prospective franchisee at least ten days before any contract is signed or consideration received. Ind.Code § 23–2–2.5–9. The statute then proceeds to authorize the Indiana securities commissioner to investigate possible violations of the statute, to issue cease and desist orders, and to seek to both enjoin noncompliance and enforce compliance with the statute. Ind.Code §§ 23–2–2.5–32 through 34.

We conclude, from both the legislature's failure to use words like "void" or "unenforceable" in the statute and its inclusion of remedial provisions to be invoked in the event of violations, that the legislature did not intend that every contract made in violation of the Franchise Acts be void. Rather, we take the same balancing approach we did in *Fresh Cut* and analyze the agreement using the factors identified in footnote 9, *supra.* Those considerations were (i) the nature of the subject matter of the contract; (ii) the strength of the public policy underlying the statute; (iii) the likelihood that refusal to enforce the bargain or term will further that policy; (iv) how serious or deserved would be the forfeiture suffered by the party attempting to enforce the bargain; and (v) the parties' relative bargaining power and freedom to contract. *Fresh Cut,* 650 N.E.2d at 1130.

---

9. Those considerations were (i) the nature of the subject matter of the contract; (ii) the strength of the public policy underlying the statute; (iii) the likelihood that refusal to enforce the bargain or term will further that policy; (iv) how serious or deserved would be the forfeiture suffered by the party attempting to enforce the bargain; and (v) the parties' relative bargaining power and freedom to contract. *Fresh Cut,* 650 N.E.2d at 1130.

10. For example, Ind.Code § 4–13.6–5–11 declares that "[a]ll public works contracts not let in conformity with [the bidding requirements for state public works projects contained in that] chapter are void." Ind.Code § 20–1–19–19 provides that "[a]ny obligation, negotiable or non-negotiable, providing for payment for a course or courses of instruction shall be void if the postsecondary proprietary educational institution is not accredited to operate in the State of Indiana."

Ind.Code § 26–2–5–1 declares that "[a]ll provisions, clauses, covenants, or agreements contained in, collateral to, or affecting any construction or design contract except those pertaining to highway contracts, which purport to indemnify the promisee against liability for: (1) death or bodily injury to persons; (2) injury to property; (3) design defects; or (4) any other loss, damage or expense arising under either (1), (2) or (3); from the sole negligence or willful misconduct of the promisee or the promisee's agents, servants or independent contractors who are directly responsible to the promisee, are against public policy and are void and unenforceable." And Ind.Code § 31–8–2–2 provides that "[a] surrogate agreement described in section 1 of this chapter that is formed after March 14, 1988, is void."

Applying those factors here, we find no compelling argument to declare the contract void. We start with two general observations relevant to several of the considerations. First, the nature of this contract is one governing the relationship of a professional sports franchise to the league of which it is a member. Second, there is absolutely no suggestion of unequal bargaining power; the franchisee (the party designed to be protected by the Franchise Acts) appears in all respects to have been a well-advised, sophisticated businessman who entered into the contract freely.

There is nothing inherent in the subject matter of this contract which suggests that it should not be enforced. *Cf. Straub v. B.M.T. by Todd,* 645 N.E.2d 597, 598 (Ind.1994), where the subject matter at issue was whether a parent could "contract away his or her rights and obligations to a child and/or the child's right to support through a preconception contract for fertilization." While the integrity of offers and sales of franchises in Indiana is certainly an important public policy, we see little likelihood that refusal to enforce a professional sports franchise agreement between highly sophisticated parties will further that policy. In short, a sports franchise agreement among highly sophisticated parties is so far from the typical franchise transaction which the Franchise Acts were designed to regulate that we can adhere to our strong presumption in favor of the enforceability of contracts without undermining the purposes of the Acts.[11] And because of the parties' relatively equal bargaining power and freedom to contract and the absence of any other significant extenuating circumstances, we believe any forfeiture that would be suffered here if the bargain were not enforced would be undeserved.[12]

We conclude that the franchise agreement was not void as against public policy.

*Conclusion*

We (i) grant transfer, (ii) adopt and incorporate by reference that part of the opinion of the Court of Appeals holding that the contract between CBA and Ellenstein is subject to the Franchise Acts, (iii) hold that Ellenstein's Disclosure Claim and Franchise Fraud Claims are contrary to law, and (iv) hold that the contract between CBA and Ellenstein is not void as against public policy. We remand for determination of liability and damages issues with respect to Ellenstein's Termination Claim and CBA's contract claim.

SHEPARD, C.J., and DeBRULER, DICKSON and SELBY, JJ., concur.

**11.** *Cf. Noble v. Alis,* 474 N.E.2d 109, 111 (Ind.Ct. App.1985), *trans. denied,* where the contract invalidated involved the prototypical transaction which the municipal ordinance at issue attempted to regulate.

**12.** *Cf. Weaver v. American Oil Co.,* 257 Ind. 458, 464, 276 N.E.2d 144, 148 (1971), where the contract at issue was invalidated after this court found a "prodigious amount of bargaining power on behalf of the stronger party which [was] used to the stronger party's advantage and [was] unknown to the lesser."