**DICK CORPORATION, Appellant–Plaintiff,**

v.

**Gordon H. GEIGER, Eduardo Calanog, and Albert Lucas, Appellees–Defendants.**

No. 29A03–0206–CV–212.

Court of Appeals of Indiana.

Feb. 17, 2003.

loan proceeds to pay Qualitech creditors other than DC. Following the trial court's grant of summary judgment in favor of Defendants on the conversion claims, DC appealed. Defendants subsequently filed an interlocutory appeal challenging the trial court's denial of their summary judgment motion on the issue of constructive fraud. Both cases have been consolidated for purposes of appeal, and we find the following issue dispositive: whether the parties' mutual release was conditioned upon the performance of certain obligations excluded from the release.

Because we conclude that the excluded obligations were not conditions precedent to the release, we affirm in part, reverse in part, and remand.

## FACTS AND PROCEDURAL HISTORY [1]

On June 20, 1996, Qualitech and DC entered into a contract for the construction of a state of the art special bar quality steel mill in Pittsboro, Indiana. Qualitech was a start-up company with virtually no other assets other than the mill it was building. Gordon Geiger served as Qualitech's CEO and Chairman of the Board, Eduardo Calanog functioned as Qualitech's President and was a board member, and Albert Lucas served as Treasurer, Director of Finance and Accounting, and Assistant Secretary.[2] DC served as the general contractor of the construction project with the responsibility to build the facility, including providing foundations, buildings, and roads and installing the steelmaking equipment.

Pursuant to a March 1998 contract amendment, the contract price for the inte-

J. Bradford McIlvain, John J. Higson, Dilworth Paxson LLP, Philadelphia, PA, David B. Vornehm, Richard S. Pitts, Drewry, Simmons, Pitts & Vornehm, Indianapolis, IN, Attorneys for Appellant.

Robert D. MacGill, Anne C. McGown, Terri L. Bruksch, Barnes & Thornburg, Indianapolis, IN, Attorneys for Appellees.

## OPINION

KIRSCH, Judge.

This case arises from a complaint filed by Dick Corporation ("DC") alleging *inter alia* civil and criminal conversion and constructive fraud against Gordon Geiger, Eduardo Calanog, and Albert Lucas ("Defendants"), who served as former officers and directors of Qualitech Steel Corporation ("Qualitech"), based upon their use of

---

1. Oral argument in this case was held January 21, 2003, at the Krannert Graduate School of Management, Purdue University. We express our gratitude to our host, the parties, and counsel.

2. The Defendants served as directors and officers between July 1996 and March 1999.

grated design and construction of the mill was in excess of $118 million with payments to be made according to a fixed payment schedule. The final payment of $4,399,504.75 was due to be paid following completion of the project and subject to certain performance criteria, namely "hot and cold test guarantees" being satisfied. Qualitech obtained financing for the construction project from various lenders, which included a $40 million revolving credit line to be used as working capital. The terms of the construction loan required a Qualitech officer to certify that a draw on the revolving credit line would be used to pay project costs, which included "capital expenditures, working capital or other operating costs [that] are necessary for the construction and operation of the Project." *Appellant's Appendix* at 342a.

By the beginning of 1998, although the mill was still several months from completion, it was becoming apparent to Qualitech that it was in deteriorating financial condition. An operating budget completed in March 1998 and presented to Defendants forecast that Qualitech would continue to suffer a cash-flow problem and be unable to pay its debts by November 1998. This projected shortfall was not specifically discussed with DC prior to its execution of the contract amendment in March 1998.

DC completed the mill on schedule. In May 1998, DC turned over the mill building to Qualitech and in July 1998 turned over the melt shop and equipment. DC sent its final invoice to Qualitech on September 25, 1998 seeking payment of $4,399,504.75. On October 20, 1998, Qualitech sent a letter to DC stating that it had reviewed the project and identified certain items that needed to be "cleared up" before payment of the final invoice. *Appellant's Appendix* at 312a. Qualitech's letter also declared that once agreement was reached on the items that it was "prepared

to provide payment." *Appellant's Appendix* at 312a. A solution was reached and sometime later in October or November 1998, Geiger sent a memorandum to all those who worked on the mill construction, which in pertinent part stated:

> On behalf of myself and the Qualitech family I want to express my sincere thanks to you for your hard work and efforts in building our steel mill. You will have built the mill in just 17 months from the first concrete pour, which is close to, if not in fact, a record. Most importantly, you have done so very safely, with an excellent safety record of which you can be very proud. Your productivity has been outstanding, allowing us to keep within our budget parameters.

*Appellant's Appendix* at 315a.

In November 1998, Qualitech submitted notice in accordance with its credit agreement with its lenders that it was requesting a term loan in the amount of $41,815,790 from which it would prepay the outstanding revolving credit loan of $13,500,000 thereby leaving it with net proceeds of $28,315,790 to pay project costs. In further compliance with the credit agreement, Qualitech prepared a "Use of Advance Certificate" for its lenders in which it certified that the loan would be used only to pay project costs that had been incurred or were scheduled to be incurred along with supporting documentation. *Appellant's Appendix* at 342a. The lenders refused to fund the November 4 draw request until receiving further information concerning Qualitech's open invoices. On November 13, 1998, a revised draw request was sent to the lenders, which included project costs that had not been paid, including DC's final invoice for $4.399 million. The draw request was still not funded because the lenders again requested more detailed information. A sec-

ond revised draw request was submitted on November 16, 1998, and on or about November 17, 1998, the lenders wired $28,315,790 to Qualitech's operating account at Mellon Bank.

Despite the designation of the $4.399 million for payment to DC, Qualitech did not make final payment. Aware that Qualitech had received funding, DC wrote in a December 18, 1998 letter to Qualitech that it had been awaiting final payment (excluding pending change orders) for almost three months and that if payment was not received by December 23, 1998, DC would "have no choice but to declare Qualitech in default and [to] exercise all available legal remedies to secure and recover the funds due us." *Appellees' Appendix* at 165B. On December 23, 1998, Geiger and Peter Matt of Credit Suisse First Boston met at the Pittsburgh airport with Ken Martin, Roger Peters, Esq., and Ken Burk, all with DC, to discuss Qualitech's financial situation, the outstanding final payment, and efforts Qualitech was taking to arrange payment. The next day, DC sent Qualitech a letter in which it thanked Qualitech for the meeting and its candor concerning its financial situation, declared Qualitech in default, and expressed the desire to resolve the outstanding final contract payment of $4.399 million and open change orders.

Negotiations between the parties occurred in January, and on February 4, 1999, DC sent a letter to Qualitech confirming their agreement with respect to the final contract payment of $4.399 million and payment for the outstanding change orders in the amount of $3 million. DC requested a Qualitech signature on the "letter agreement," which Geiger executed and returned to DC. *Appellees' Appendix*

at 181–182B. By letter dated February 5, 1999, DC sent its Change Order No. 106 ("Settlement Change Order"), which confirmed the previous letter agreement. The Settlement Change Order was executed on February 25, 1999 by Qualitech and on March 1, 1999 by DC. Attachment A to the Settlement Change Order contains four paragraphs, one of which is a mutual release of claims and three of which provide for payment in the event of: 1) Qualitech's continued operation; 2) Qualitech's sale of the business or assets and/or additional investment; and 3) Qualitech's bankruptcy.

Qualitech filed for bankruptcy on March 22, 1999. DC submitted a claim for over $7 million, which amount represents the $4.399 million final payment and the $3 million change order agreement less the total amount of $550,000 paid by Qualitech in February 1999.[3] Qualitech does not dispute the claim, and the bankruptcy court has not confirmed a final plan.

On November 12, 1999, DC filed its complaint against Defendants alleging constructive fraud, conversion, and negligent misrepresentation. Defendants subsequently filed their motion for summary judgment, and following a hearing on May 9, 2002, the trial court granted summary judgment in favor of Defendants on DC's conversion claims and denied them summary judgment on the constructive fraud claim.

## DISCUSSION AND DECISION

Our standard of review of a summary judgment order is well-settled: summary judgment is appropriate if the "designated evidentiary matter shows that there is no genuine issue as to any material fact and

---

3. $350,000 of this total applied to the Settlement Change Order, and $200,000 applied to the outstanding contract balance.

that the moving party is entitled to judgment as a matter of law." Ind. Trial Rule 56(C). Relying on specifically designated evidence, the moving party bears the burden of making a prima facie showing that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *I/N Tek v. Hitachi Ltd.*, 734 N.E.2d 584, 586 (Ind. Ct.App.2000), *trans. denied.* If the moving party meets these two requirements, the burden shifts to the nonmovant to set forth specifically designated facts showing that there is a genuine issue for trial. *Id.* A genuine issue of material fact exists where facts concerning an issue that would dispose of the litigation are in dispute or where the undisputed material facts are capable of supporting conflicting inferences on such an issue. *Gilman v. Hohman*, 725 N.E.2d 425, 428 (Ind.Ct.App. 2000), *trans. denied.* Even if the facts are undisputed, summary judgment is inappropriate where the record reveals an incorrect application of the law to the facts. *Id.*

A trial court's grant of summary judgment is clothed with a presumption of validity, and the party that lost in the trial court has the burden of demonstrating that the grant of summary judgment was erroneous. *City of Indianapolis v. Byrns*, 745 N.E.2d 312, 316 (Ind.Ct.App.2001). On appeal, we are bound by the same standard as the trial court, and we consider only those matters that were designated at the summary judgment stage. *Interstate Cold Storage v. Gen. Motors Corp.*, 720 N.E.2d 727, 730 (Ind.Ct.App.1999), *trans. denied.* We do not reweigh the evidence, but we liberally construe all designated evidentiary material in the light most favorable to the nonmoving party to determine whether there is a genuine issue of material fact for trial. *Estate of Hofgesang v. Hansford*, 714 N.E.2d 1213, 1216 (Ind.Ct.App.1999). A grant of summary judgment may be affirmed upon any theory supported by the designated materials. *Bernstein v. Glavin*, 725 N.E.2d 455, 458 (Ind.Ct.App.2000), *trans. denied.*

■ Although not a specific basis of the trial court's summary judgment order, Defendants contend, and we agree, that the trial court may be affirmed because under the language of the Settlement Change Order and the fourth paragraph in Attachment A to the Settlement Change Order, the claims were released.

The language of release in the Settlement Change Order is as follows:

> Subject only to the obligations of Qualitech to pay Dick as set forth in Attachment "A" and Dick's warranty obligations and otherwise only reserving claims for personal injury or property damage, Dick and Qualitech ... hereby mutually and fully release each other, and their successors, assigns, affiliates, subcontractors, agents, sureties, and other representatives, and each of them from any claims, damages, demands, and actions of any nature whatsoever which either party may have against the other party, arising out of or otherwise relating to any work performed in connection with the Contract between the parties or the Project.

*Appellees' Appendix* at 188B. Attachment A to the Settlement Change Order establishes the funding mechanism for the parties' revised agreement. It provides the method of payment under the following three scenarios: 1) Qualitech's continued operation; 2) Qualitech's sale of the business or assets and/or additional cash investment; and 3) Qualitech's filing of bankruptcy. *Appellant's Appendix* at 189B. The fourth paragraph of Attachment A containing the release specifically provides: "The execution by Qualitech and Dick of a mutual release of any and all claims relating to this Project excluding a

release of Qualitech's obligations included in this letter agreement and a release of Dick Corporation's warranty obligations." *Appellant's Appendix* at 189B. This provision contemplated a separate release, which was contained in the Settlement Change Order.

The third paragraph of Attachment A to the Settlement Change Order provided that if Qualitech filed for bankruptcy, it would acknowledge DC's claim for outstanding amounts due under the Settlement Change Order. Defendants initially argue that they did not dispute or object to DC's $7,014,602.55 bankruptcy claim. Therefore, they maintain that Qualitech acknowledged its payment obligations as contemplated by the Settlement Change Order. They further argue that the plain and unambiguous language of the release provisions establish the parties' intent to mutually release the other party, subject only to Qualitech's obligation to pay DC the $4.399 million contract price plus the additional $3 million for change orders. According to Defendants, reading the release provisions together establishes that "the parties intended only to exclude Qualitech Steel's payment **obligations** from the scope of the release, not to make payment a condition precedent to the release." *Appellees' Brief* at 37 (emphasis in original). Defendants thus contend that the parties did not intend the mutual release to be conditioned upon actual payment and that it is error to read the release in a way that makes payment a condition precedent.

DC, by contrast, maintains that the release language is written so as to create the express condition of DC's receipt of payment from Qualitech. DC states that Defendants' interpretation of the release provisions is inconsistent with the plain language of the release. The plain and unambiguous provisions of the Settlement Change Order, according to DC, establish

that the release was expressly conditioned on the satisfaction of "the obligations of Qualitech to pay Dick as set forth in Attachment A." *Appellees' Appendix* at 188B. It is undisputed that Qualitech did not pay DC pursuant to the scheduled payment structure for the change orders in the first paragraph of Attachment A with the exception of $350,000 paid in February 1999. Therefore, DC claims the condition precedent to the release was not satisfied. The release did not become effective until Qualitech made the scheduled payments as specified in Attachment A, which it did not.

■ The courts of this state have a long tradition of recognizing and respecting the freedom to contract. Our courts have consistently expressed their commitment to advancing the public policy supporting the enforcement of contracts. *Zollman v. Geneva Leasing Assoc's, Inc.*, 780 N.E.2d 387, 391 (Ind.Ct.App.2002) (citing *Trimble v. Ameritech Publ'g, Inc.*, 700 N.E.2d 1128, 1129 (Ind.1998); *Fresh Cut, Inc. v. Fazli*, 650 N.E.2d 1126, 1129 (Ind.1995); *Candlelight Props., LLC v. MHC Operating Ltd. P'ship*, 750 N.E.2d 1, 10 (Ind.Ct.App.2001), *trans. dismissed* ). There is a very strong presumption of enforceability of contracts representing the freely bargained agreement of the parties. *Id.* (citing *Trotter v. Nelson*, 684 N.E.2d 1150, 1152 (Ind.1997); *Cont'l Basketball Ass'n, Inc. v. Ellenstein Enters. Inc.*, 669 N.E.2d 134, 139 (Ind. 1996)). This principle is based upon the rationale that it is in the best interest of the public for. courts not to unnecessarily restrict the freedom to contract. *Id.* ·at 392. Further, Indiana has long allowed contracting parties to enter into any agreement they desire so long as it is not illegal or against public policy. *Id.* (citing *Cowper v. Collier*, 720 N.E.2d 1250, 1255 (Ind. Ct.App.1999)).

The standard of review for reviewing· a contract on appeal is well established. In most cases, the intent of the parties to a contract is to be determined by the "four corners" of the contract. *Keithley's Auction Serv. v. Children of Jesse Wright,* 579 N.E.2d 657, 659 (Ind.Ct.App.1991). Where the language of an instrument is unambiguous, we give effect to the intentions of the parties as· expressed in the four corners of the document. · *Art Country Squire, L.L.C. v. Inland Mortgage Corp.,* 745 N.E.2d 885, 889 (Ind.Ct.App. 2001); *Orme v.· Estate of Kruwell,* 453 N.E.2d 355, 356 (Ind.Ct.App.1983). Clear, plain, unambiguous terms are conclusive of that intent. *Art Country Squire,* 745 N.E.2d at 889. We will neither construe clear ànd unambiguous provisions nor add provisions not agreed upon by the parties. *Id.* The meaning of a contract is to be determined from an examination of all· of its provisions, not from a consideration of individual words, phrases, or even paragraphs read alone. *Id.*

■ If an ambiguity arises because of the language used in a contract and not because of extrinsic facts, construction of the contract is purely a question of law to be resolved by the court. *Merrillville Conservancy Dist. ex rel. Bd. of Directors v. Atlas Excavating, Inc.,* 764 N.E.2d 718, 724 (Ind.Ct.App.2002) (citing *First Fed. Sav. Bank v. Key Markets,* 559 N.E.2d 600, 603 (Ind.1990)). An ambiguous contract will be construed against the party that drafted it. *Id.* (citing *Keithley's,* 579 N.E.2d at 659). However, the terms of a contract are not ambiguous simply because a controversy exists between the parties concerning the proper interpretation· of terms. *Ostrander v. Bd. of· Directors of Porter County Educ. Interlocal,* 650 N.E.2d 1192, 1196˙ (Ind.Ct.App.1995), *trans. denied.*

■ At issue here is the construction of a release provision. A separate release agreement is a species of contract that surrenders a claimant's right to prosecute a cause of action. *Zollman,* 780 N.E.2d at 392. "Our supreme court has stated that upholding releases serves an important public policy because it facilitates the orderly settlement of disputes." *Id.* (quoting *Prall v. Indiana Nat'l Bank,* 627 N.E.2d 1374, 1377 (Ind.Ct.App.1994)). . Interpretation of a release, like any other contract, is determined by the terms of the particular instrument, considered in light of all facts and circumstances. *Id.* (citing *Prall,* 627 N.E.2d at 1377). Absent an ambiguity, release provisions are interpreted as a matter of law, and we look only to the instrument to ascertain the parties' intent. *Id.* If the contract is ambiguous and the ambiguity arises from extrinsic facts and a genuine issue exists as to those facts, summary judgment is inappropriate. *Id.*

Here, DC does not argue that the release provision was ambiguous. Further, there· is no evidence in the record before us on appeal that the bargaining between the parties was not free and open. Instead, the record reveals that both DC and Defendants were sophisticated parties and were adequately represented by legal counsel during the arms-length negotiation of the release. Nonetheless, the parties on appeal disagree as to whether the release was meant to "exclude" the payment obligation or whether payment was a condition precedent to·the release.

■ " 'If judges could interpret a release to mean something that is contrary to the· plain language because one party intended for it to mean something else, then parties would be discouraged from signing releases because they could not have confidence that a court would enforce the release's plain language.' " *Id.* at 393 (quoting *Estate of Spry v. Greg & Ken;*

*Inc.,* 749 N.E.2d 1269, 1275 (Ind.Ct.App. 2001)). Our paramount goal is to ascertain and give effect to the intent of the parties as reasonably manifested by the language of the agreement. *Id.*

The plain and ordinary language of the release establishes that payment was not a condition precedent to the effectiveness of the release. The language of release as contained in Attachment A provides that the execution of a mutual release of claims would exclude only Qualitech's obligations included in the letter agreement (i.e., its obligation to pay the contract price) and DC's warranty obligations. The scope of release is therefore everything except these two events. The language of release in the Settlement Change Order states that the release is "[s]ubject only to the obligations of Qualitech to pay DC as set forth in Attachment 'A'" and DC's warranty obligations. *Appellees' Appendix* at 188B. The Settlement Change Order with Attachment A became an amendment to the parties' agreement with the purpose to limit what was in dispute with respect to the outstanding change orders and to establish a payment mechanism. Construing these documents together, the release was intended only to exempt from release the payment obligation of Qualitech. Given the language "subject only to the obligations . . . to pay" and "excluding a release of Qualitech's obligations," the parties did not intend the release to be conditioned upon actual payment by Qualitech. No other language in the release contradicts the notion that the parties intended to exclude Qualitech's payment obligations from the scope of the release and instead make payment a condition to the release.

We further note that DC used the Settlement Change Order to its advantage by relying upon the amount Qualitech still owed DC under the negotiated agreement when filing its claim for over seven million dollars in the bankruptcy court. In negotiating the Settlement Change Order, the parties considered the possibility of Qualitech's bankruptcy and pursuant to the third paragraph of the Settlement Change Order agreed that if Qualitech filed bankruptcy it would acknowledge a claim for the unpaid amount (i.e., acknowledge its obligation to pay). Qualitech has not disputed this claim. Because DC pursued its right to payment in the bankruptcy court by relying upon the Settlement Change Order, DC cannot now consistently maintain that Qualitech's failure to pay amounted to a breach of the agreement.

Given the clear and unambiguous provisions of the Settlement Change Order and the importance of the public policy underlying release provisions, we conclude that the release is effective. Moreover, given that we may not rewrite the contract for the parties and will apply contractual provisions according to their plain language, we hold that the release provision is fully applicable and that the trial court should have properly applied the release in its summary judgment determination to find that all claims had been released. Accordingly, that portion of the summary judgment order granting summary judgment to Qualitech on the conversion claims is affirmed; that portion of the order denying summary judgment to Qualitech on the constructive fraud claim is reversed, and this cause is remanded to the trial court with instructions to enter summary judgment in favor of Defendants on this claim.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

ROBB, J., and BAILEY, J., concur.