**UNPUBLISHED ORDER**
Not to be cited per Circuit Rule 53

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois  60604**

Argued September 28, 2005
Decided December 14, 2005

**Before**

Hon. Joel M. Flaum,  *Chief Judge*

Hon. Daniel A. Manion,  *Circuit Judge*

Hon. Terence T. Evans,  *Circuit Judge*

| | |
|---|---|
| No. 04-3305 | Appeal from the United States District Court for the Southern District of Indiana, Indianapolis Division |
| Northstar Partners, *Plaintiff-Appellant*, | |
| *v.* | No. 03 C 127 |
| Marsh Supermarkets, Inc., *Defendant-Appellee*. | **David F. Hamilton**, *Judge*. |

## O R D E R

Northstar Partners sued its tenant Marsh Supermarkets, LLC, contesting the amount of rent due under the lease.  Northstar Partners contends that Marsh Supermarkets owes additional rent based on an expansion of the storeroom.  The district court concluded that, under the terms of the lease, the expansion of the storeroom did not change the amount of rent due.  We affirm.

### I.

In 1977, Marsh Supermarkets, LLC ("Marsh") entered into a lease with Northstar Partners ("Northstar"), in which Marsh agreed to rent space as the

anchor tenant in a shopping center owned by Northstar.[1]   The lease provided for an initial term of twenty years, with Marsh holding the option to extend the lease for an additional five years, up to four times.

Marsh expanded the storeroom in 1991, adding 12,824 square feet at a cost exceeding $1.5 million.  The lease anticipated the expansion, and provided that "[n]o such addition, alteration, or remodeling shall be cause for the modification of any of the terms and provisions hereof." The lease further provided that at the expiration of the lease, Northstar will take possession of the expanded structure.

After the expansion, in 1997, Marsh exercised its first option to extend the lease. Throughout the initial twenty-year term and the first optional term, the lease required Marsh to pay $11,122.75 in monthly rent. The parties performed the lease, apparently without incident, for those first twenty-five years.

On May 15, 2002, Marsh exercised its second option to extend the terms of the lease, thereby extending the lease until November 30, 2007.  Under the terms of the lease, the rent due changed after the initial and first optional terms, thus precipitating the present dispute.  Specifically, the lease provided that the rent "shall be $3.00 per square foot" in the second, third, and fourth optional terms. After Marsh exercised the second option, Northstar informed Marsh that it owed rent based on the expanded square footage.  While Marsh continued to pay rent on the original square footage, Marsh refused to pay rent on the expanded square footage.  Marsh claimed that the expansion did not change any terms of the lease, including the rental calculation, and therefore no additional rent is due for the expanded square footage.

To resolve this issue, Northstar sued Marsh, seeking a declaratory judgment regarding the amount of rent due and claiming a breach of contract for the allegedly unpaid rent on the expanded square footage.  The parties both moved for summary judgment.  The district court examined "the four corners of the lease document, seasoned by a little common sense." Reasoning that the parties did not intend to change the terms of the lease and that changing the square footage would constitute a change in the terms, the district court granted summary judgment to Marsh. According to the district court, this determination was "the most natural reading" of the lease. The district court considered it "improbable" that Marsh would build a

---

[1]  Marsh and Northstar are both successors-in-interest to the original parties to the lease, Marsh Supermarket, Incorporated and Speedway Plaza Associates.  For simplicity, we refer to Marsh and Northstar as the parties throughout this opinion.

$1.5 million expansion that would belong to Northstar at the end of the lease, and also agree to pay rent on the additional space. The district court therefore concluded that Northstar could collect rent based only on the original square footage, not the expanded square footage. Northstar appeals.

## II.

We review a district court's grant of summary judgment de novo. *Isbell v. Allstate Ins. Co.*, 418 F.3d 788, 793 (7th Cir. 2005) (citation omitted). Summary judgment is appropriate if "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(c)). In this diversity case, the parties agree that Indiana law applies.

To determine what evidence may be considered in analyzing this dispute, we must first determine whether the lease is ambiguous. Under Indiana law, "[t]he determination of whether a contract is ambiguous is a question of law for the court." *Art Country Squire v. Inland Mortgage Corp.*, 745 N.E.2d 885, 889 (Ind. Ct. App. 2001). To analyze ambiguity, Indiana courts consider "whether reasonable men would find the contract subject to more than one construction." *Keithley's Auction Serv. v. Wright*, 579 N.E.2d 657, 659 (Ind. Ct. App. 1991) (citing *Ebert v. Grain Dealers Mut. Ins. Co.*, 303 N.E.2d 693, 698 (Ind. Ct. App. 1973)). Indiana courts have also cautioned that "the terms of a contract are not ambiguous simply because a controversy exists between the parties concerning the proper interpretation of terms." *Dick Corp. v. Geiger*, 783 N.E.2d 368, 374 (Ind. Ct. App. 2003) (citing *Ostrander v. Bd. of Dirs. of Porter County Educ. Interlocal*, 650 N.E.2d 1192, 1196 (Ind. Ct. App. 1995)). Additionally, Indiana courts advise that,

> In most cases, the intent of the parties to a contract is to be determined by the "four corners" of the contract. [If] the language of an instrument is unambiguous, we give effect to the intentions of the parties as expressed in the four corners of the document. Clear, plain, unambiguous terms are conclusive of that intent.

*Id.* (internal citations omitted).

Applying this standard, we examine whether the language in dispute is ambiguous. The critical passage at issue states: "the rental provided for in Section IV A shall be $3.00 per square foot for the 2nd, 3rd and 4th option terms." Lease § III(B). This section contains "clear" and "plain" terms. *Dick Corp.*, 783 N.E.2d at

374. The question is how to interpret the term "square foot." This question can be resolved through an interpretation of the lease and, as discussed below, reasonable individuals would not consider the term "subject to more than one construction." *Keithley's Auction Serv.*, 579 N.E.2d at 659. Even though the parties disagree whether this term refers to the original or expanded square footage, the term is not ambiguous when read in the context of the lease.

Since the lease is not ambiguous, we limit our review to the language of the lease. *Dick Corp.*, 783 N.E.2d at 374 ("Absent an ambiguity . . . we look only to the instrument to ascertain the parties' intent." (citation omitted)); *see also Art Country Squire*, 745 N.E.2d at 889 ("In interpreting an unambiguous contract, we give effect to the intentions of the parties as expressed in the four corners of the document."). Furthermore, since the language is unambiguous, the court does not construe the lease language against either party. *See Keithley's Auction Serv.*, 579 N.E.2d at 659 ("An *ambiguous* contract is construed against the party who furnished and drafted the agreement." (emphasis added, citation omitted)).

Turning to the language of the lease, we interpret the provisions involving rent. During the initial term and the first optional term, the lease provides that:

> [Marsh] shall pay to [Northstar] as the monthly base rental hereunder, the sum of [ ] ($11,122.75) representing an annual rate of [ ] ($133,473.00) or 3.73 Dollars per square foot on 35,760 square feet of storeroom, in advance, on or before the first day of each calendar month, by check . . .

Lease § IV(A). If Marsh elects to extend the lease for the second, third, and fourth optional terms, the lease provides

> for an additional term of sixty (60) months upon the same terms and conditions as those herein stated, *except* that the rental provided for in Section IV A hereof shall be *$3.00 per square foot* for the 2nd, 3rd and 4th option terms, only if so exercised.

Lease § III(B) (emphasis added). The "except" clause in section III(B) demonstrates that the only term that changes in the second, third, and fourth optional terms is the rental rate, and not the square footage. In fact, section III(B) explicitly refers to section IV(A) of the lease, which addressed the square footage. Reading the new rate provided in section III(B) with the language in section IV(A), the combined language would provide that:

> [Marsh] shall pay to [Northstar] as the monthly base rental hereunder, *$3.00 per square foot* on 35,760 square feet of storeroom, in advance, on or before the first day of each calendar month, by check . . .

Lease § III(B); IV(A).  Thus, by making the only change that the lease itself authorizes for the second, third, and fourth optional terms, the square footage does not change.  The lease does not entitle Northstar to additional rent on the expanded square footage.

In response, Northstar argues that because section III(B) did not define square footage as the "35,760 square feet of storeroom," the plain language of "per square foot" in Section III(B) must refer to the expanded square footage.  The fact that the initial rental rate was a sum certain of $11,122.75 per month, and not based on square footage, bolsters this argument.  The sum certain was modified by the phrase "representing an annual rate of [ ] ($133,473.00) or 3.73 Dollars per square foot on 35,760 square feet of storeroom," but that modifying phrase was not the basis of the monthly rent amount.[2]  This, Northstar argues, entails that the entire modifying phrase, including the critical "on 35,760 square feet of storeroom," should be disregarded in considering the new rental rate.  Without this modifying phrase, Northstar concludes that the square footage in section III(B) refers to the actual, expanded square footage.

Northstar's argument fails for two reasons.  First, as discussed above, section III(B), which sets forth the new rental rate, explicitly refers to section IV(A), which specifies that the rent is calculated "on 35,760 square feet of storeroom."  Thus, it would be improper to interpret III(B) without reference to section IV(A) or to omit the designated square footage, which may sensibly be read with the new rental rate.  Second, the lease emphasizes that the terms of the lease will not change in the event of an expansion.  The section that permits expansion of the storeroom states that "[n]o such addition, alteration, or remodeling shall be cause for the

---

[2] The fact that "3.73 Dollars per square foot" is a description of the rental rate and not the basis for the calculation of the rate is evident by arithmetic, as Northstar illustrates in its brief.  Multiplying the $3.73 rate by 35,760 square feet does not equal the annual rent of $133,473.00, to which the parties agreed  (35,760 x $3.73 = $133,384.80).  Instead, the calculation yields an annual rent $88.20 less than the agreed upon amount ($133,473.00 - $133,384.80 = $88.20).  To obtain the actual figures in the lease agreement, one must divide the annual rent by the square footage and then round the rental rate to the hundredths ($133,473.00 ÷ 35,760 = $3.7324664).  This suggests that the parties agreed to an annual rent for the initial term and then calculated the rental rate per square foot.

modification of any of the terms and provisions hereof." Lease § VIII. Applying the new rental rate to the expanded square footage would constitute a modification of the terms in violation of section VIII. Therefore, we conclude that without a more explicit provision referring to "existing" or "expanded" or even "all" square footage, the optional term rental rate refers to the original 35,760 square feet of storeroom referenced in section IV(A).

Northstar further argues that other sections of the lease use the term "square foot" to refer to the expanded square footage. In particular, Northstar argues that the common area maintenance charges are based on the expanded square footage, just as the new rental rate should be based on the expanded square footage. This argument fails, however, because the language of the lease involving the maintenance charges uses different terms. Specifically, the lease requires Marsh to pay its "proportionate share" of tax and maintenance expenses. Lease §§ IV(B), VI(B). This proportionate share is based on "demised footage," which the lease defines as "[t]he square footage of the demised storeroom." Lease § IV(B). The "square footage" in section III(B), however, does not refer to the demised footage. Instead, as discussed above, section III(B) explicitly refers to section IV(A), which in turn describes rent based on 35,760 square feet of storeroom. The use of "square footage" in the rental rate section is therefore distinguishable from the demised footage used to calculate the maintenance charges.

The conclusion that the rental rate is based on the original square footage comports with common sense. The parties bargained for a decrease in the rental rate after the initial twenty-five years. This reduction is reasonable, considering that the construction would be fully amortized after that period, resulting in greater net income for Northstar. Requiring Marsh to pay additional rent on an expansion that it built at a cost exceeding $1.5 million, and which will remain part of the premises for Northstar to rent in the future, is economically unbalanced. As the district court noted, "[t]hat result is so improbable that it would require much more specific language to compel it." *Northstar Partners v. Marsh Supermarkets*, No. 03-C-127, 2004 WL 1784903 at *4 (S.D. Ind. Aug. 2, 2004) (citing *Rhode Island Charities Trust v. Englehard Corp.*, 267 F.3d 3, 7 (1st Cir. 2001) ("Parties can contract for preposterous terms. If contract language is crystal clear or there is independent extrinsic evidence that something silly was actually intended, a party may be held to its bargain, absent some specialized defense.") (emphasis omitted)). Northstar fails to show that the parties intended such an economically lopsided lease agreement. Accordingly, we will not sanction a strained reading of the lease that defies common sense.

## III.

We note that the original parties to this lease could have precluded this dispute by more careful drafting. Regardless, the reasonable interpretation of the lease is to calculate the optional term rent based on the original square footage. Northstar's arguments to the contrary are unavailing. During the second, third, and fourth optional terms of the lease, we interpret the lease as providing a rental rate of $3.00 per square foot based on the original 35,760 square feet of the storeroom. The expansion of the storeroom does not alter the calculation of the rent. Accordingly, we AFFIRM the judgment of the district court.