Richard MOORE, Appellant–Defendant,

v.

WELLS FARGO CONSTRUCTION,
Appellee–Plaintiff.

No. 84A04–0808–CV–477.

Court of Appeals of Indiana.

March 27, 2009.

Gary G. Hanner, Hanner, Hanner & Hanner, Rockville, IN, Attorney for Appellant.

John J. Petr, Kroger, Gardis & Regas, LLP, Indianapolis, IN, Attorney for Appellee.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

Richard Moore appeals from the trial court's judgment in favor of Wells Fargo Construction ("Wells Fargo"), formerly known as The CIT Group/Equipment Financing, Inc. ("CIT"), on its complaint [1] to recover a deficiency owed under a personal guaranty. Moore raises two issues for review:

1. Whether the evidence is sufficient to support the trial court's finding that Wells Fargo conducted the sale of a repossessed excavator in a commercially reasonable fashion.

2. Whether Wells Fargo provided adequate notice to Moore of the sale of the excavator.

We affirm.

### FACTS AND PROCEDURAL HISTORY

McCawith Energy, Inc. ("McCawith") was a mining corporation that operated a mine in Parke County, Indiana. George McGuire, Gerald Carr, Donald Wile, and Moore were principals of McCawith,

---

1. Moore has not included a copy of the complaint in his Appendix.

though Moore had a minority interest. On June 14, 2000, McCawith refinanced a 1998 Liebherr R984B excavator ("the Excavator") through CIT for $557,918.28. In return for the refinancing, Moore and the other principals executed and delivered to CIT a security agreement and a personal guaranty for the indebtedness. The security agreement provides, in relevant part:

> Upon Debtor's default and at any time thereafter, Secured Party [CIT] shall have all the rights and remedies of a secured party under the Uniform Commercial Code and any other applicable laws, including the right to any deficiency remaining after disposition of the Collateral for which Debtor hereby agrees to remain fully liable. Debtor agrees that Secured Party, by itself or its agent, may without notice to any person and without judicial process of any kind, enter into any premises or upon any land owned, leased or otherwise under the real or apparent control of Debtor or any agent of Debtor where the collateral may be or where Secured Party believes the Collateral may be, and disassemble, render unusable and/or repossess all or any item of the Collateral, disconnecting and separating all Collateral from any other property....

> Secured Party may sell or lease the Collateral at a time and location of its choosing provided that the Secured Party acts in good faith and in a commercially reasonable manner. Secured Party will give Debtor reasonable notice of the time and place of any public sale of the Collateral or of the time after which any private sale or any other intended disposition of the Collateral is to be made. Unless otherwise provided by law, the requirement of reasonable notice shall be met if such notice is mailed, postage paid, to the address of Debtor shown herein at least ten days before the time of the sale or disposition. Expenses of retaking, holding, preparing for sale, selling and the like shall include reasonable attorneys' fees and other legal expenses. Debtor understands that Secured Party's rights are cumulative and not alternative.

Appellant's App. at 24. Moore and the principals also executed a single personal guaranty ("the Guaranty") on the indebtedness. The Guaranty provides, in relevant part: "Each of us waives ... the failure to notify any of us of the disposition of any property securing the obligations of [McCawith and] the commercial reasonableness of such disposition or the impairment, however caused, of the value of such property...." Exhibit 2 at 1.[2]

McCawith defaulted on the loan from CIT in 2003, and CIT took possession of the Excavator. McCawith then filed for bankruptcy, as did all of the principals of McCawith except Moore. CIT sent a Notice of Disposition of Collateral ("First Notice") to Moore and McCawith on December 2, 2003. The First Notice apprised Moore that CIT planned to "sell the Liebherr R984B S/N: 409–2002 and any and all attachments privately sometime after Tuesday, December 16, 2003. You are hereby put on notice that CIT Group, Inc. intends to pursue a deficiency action against you for any deficiency that might exist after the sale of the collateral." Ex-

---

**2.** Moore did not include a copy of the Guaranty in his appendix. Wells Fargo relied on language in its appellee's brief and did not file an appellee's appendix to include the Guaranty. *See* Ind. Appellate Rule 50(A)(3) (defining contents of appellee's appendix). We remind counsel that, while the failure to include in a party's appendix any items required in Indiana Appellate Rule 50 does not waive review, it does hinder our review. *See* App. R. 49(B).

hibit 3 at 1.[3] On October 5, 2005, CIT sent a second Notice of Disposition of Collateral ("Second Notice") to Moore. The Second Notice provides, in relevant part:

> We will sell the One (1) 1998 Liebherr model R984B Excavator a/n [sic] 409–2002 in public as follows:
>
> Day & Date: Wednesday, October 19, 2005
>
> Time*: 8 a[.]m[.] till sold
>
> Place: www.salvagesales.com
> Salvage Sale, Inc.
> 1001 McKinney
> Houston, TX 77002
> (713) 286-4660
>
> You are hereby put on notice that CIT intends to pursue a deficiency action against you for any deficiency that might exist after the sale of the collateral.

Exhibit 4 at 1.[4]

CIT was unable to sell the Excavator through the auction website. As a result, CIT again offered the equipment for sale privately. In January 2006, Bramer & Son of Louisville, Kentucky ("Bramer") offered to purchase the Excavator for $48,000. CIT counter-offered, and Bramer agreed to buy the Excavator for $54,000. After deducting $3434 for locating and making minimal repairs to the Excavator, CIT applied $50,566 to McCawith's indebtedness, leaving a balance of $251,696.39.

In June 2006, CIT filed a deficiency action against Moore. On August 2, 2007, Wells Fargo was substituted as the plaintiff and real party in interest. A bench trial was held on March 31, 2008, and on July 3, the court entered its findings of fact and conclusions thereon in favor of Wells Fargo ("Judgment"). The Judgment provides, in relevant part:

Findings of Fact

* * *

5. On June 14, 2000, McCawith Energy, Inc. executed and delivered to CIT a Security Agreement for the financing of the Excavator at a total of $557,918.28.

6. The Security Agreement contains provisions including:

   a. The granting of a security interest in the Excavator to CIT;

   b. In the event of default, allowing CIT to require McCawith Energy, Inc. to assemble and return the Excavator to a place designated by CIT;

   c. In the event of default allowing for CIT to recover[ ] reasonable attorneys fees of at least 15% of the principal loan balance, as well as other expenses incurred in enforcing its rights thereunder; and

   d. Providing for a[n] 18% default rate of interest.

7. As an express condition of financing the Excavator for McCawith Energy, Inc., CIT required the four principals, including Richard Moore, to execute personal guaranties [sic] to secure the obligation of McCawith Energy, Inc. to CIT.

8. On June 14, 2000, George McGuire, Gerald Carr, Donald Wile and Richard Moore executed and delivered to CIT a Guaranty for the debt of McCawith Energy, Inc. to it.

9. The Guaranty contains provisions including:

   a. That it constitutes an unconditional guaranty of payment of all indebtedness of McCawith Energy, Inc. to CIT, including any deficiency established, with or without notice;

---

**3.** Moore did not include a copy of the First Notice in his appendix.

**4.** Moore did not include a copy of the Second Notice in his appendix. Also, the Second Notice does not define the asterisk after "Time."

b. A guaranty of CIT's attorney fees and expenses caused by the default of McCawith Energy, Inc.; and

c. A waiver of the guarantor basing a defense of liability on the commercial reasonableness of CIT's disposition of the collateral, or CIT's failure to notify of the disposition of collateral.

10. McCawith Energy, Inc. defaulted in payments to CIT under the Security Agreement in 2003, shut down its mining operation, and went out of business.

\* \* \*

13. Neither McCawith Energy, Inc., nor Richard Moore, advised CIT of the cessation of the mining operation, to arrange for a return of the Excavator at a place designated by CIT, or to advise as to the location of the Excavator.

14. CIT hired an outside recovery agent to locate the Excavator, which was found at a coal pit in Parke County, Indiana.

15. The Excavator was found in an inoperable state, and no key for the Excavator was left for CIT.

16. CIT incurred a total of $3,434.00 to locate the Excavator and to have it rendered minimally operational. This included $2,434.00 for "hotwiring" the Excavator due to the lack of a key, repairs to make the Excavator minimally operational, and to move it to a more accessible location for future disassembly and transport. The outside recovery agency was paid $1,000 to locate the Excavator and coordinate the repairs and initial moving of it.

17. Notices of sale were issued to McCawith Energy, Inc. and Richard Moore on December 2, 2003 concerning CIT's intention to sell the Excavator at a private sale sometime after December 15, 2003.

18. The notice of sale was sent to Richard Moore by certified mail, return receipt requested to his Riley, Indiana address, and signed for by Linda K. Moore.

\* \* \*

45. In October, 2005, after being unsuccessful in reselling the Excavator on a private sale basis up to that point, CIT attempted to sell it through Salvage Sales, Inc., an internet auction website (www.salvagesales.com). On October 5, 2005, CIT issued a second notice of sale to McCawith Energy, Inc. and Richard Moore, concerning its intention to sell the Excavator through this public internet auction website on October 19, 2005.

46. Richard Moore received the October 5, 2005[,] notice of sale at his Riley, Indiana address by certified mail, return receipt requested.

47. The Excavator did not sell via the internet auction website on October 19, 2005, resulting in CIT subsequently attempting to again resell it through private sale.

48. In January, 2006, CIT received an offer of $48,000 from Bramer & Son of Louisville, Kentucky, whose business includes site preparation and earth moving, to purchase the Excavator. CIT counter-offered, and a sale price of $54,000 was agreed to between Bramer & Son and CIT.

\* \* \*

50. After deducting the aforementioned expenses of $3,434.00, net proceeds of $50,566.00 were applied by CIT to the McCawith Energy indebtedness.

51. After applying the net proceeds of sale, the remaining loan balance was $251,696.39.

\* \* \*

57. The total amount owing to CIT on the McCawith Energy loan (remaining

loan balance, accrued contract interest, attorney fees and court costs) is the sum of $354,930.40.

\* \* \*

Having made these Findings of Fact, the Court now makes the following Conclusions of Law:

#### Conclusions of Law

\* \* \*

2. CIT gave and Defendant Moore received written notice of its intention to resell the Excavator in mitigation of the McCawith Energy debt, and to hold him liable for any deficiency.

\* \* \*

10. The Guaranty executed by the Defendant is a valid, binding and unconditional guaranty of payment under which the Defendant, Richard Moore[,] is liable to CIT for the remaining indebtedness of McCawith Energy, Inc. to CIT, including interest at the contract rate.

11. The Defendant, Richard Moore, is indebted to CIT in the sum of $317,046.40, plus attorney fees and court costs.

12. CIT has incurred attorney fees in excess of $37,754.00, which constitutes a reasonable attorney fee under the terms of the Security Agreement and Guaranty, together with $130.00 court filing fee.

13. CIT has been damaged by the Defendant, Richard Moore, in the total amount of $354,930.40.

\* \* \*

#### JUDGMENT

It is hereby ORDERED that Plaintiff, Wells Fargo Construction f/k/a The CIT Group/Equipment Financing, Inc., have and recover judgment against Defendant, Richard Moore, in the total sum of $354,800.40, plus court costs of $130.00, together with statutory interest after the date of this entry.

Appellant's App. at 5–16. Moore now appeals.

### DISCUSSION AND DECISION

#### Standard of Review

Where the trial court has entered findings of fact and conclusions thereon pursuant to Indiana Trial Rule 52, we apply the following two-tiered standard of review: whether the evidence supports the findings and whether the findings support the judgment. *Bowyer v. Ind. Dep't of Natural Resources*, 882 N.E.2d 754, 761 (Ind.Ct. App.2008). The trial court's findings and conclusions will be set aside only if they are clearly erroneous, that is, if the record contains no facts or inferences supporting them. *Id.* A judgment is clearly erroneous when a review of the record leaves us with a firm conviction that a mistake has been made. *Id.* We neither reweigh the evidence nor assess the credibility of witnesses, but consider only the evidence most favorable to the judgment. *Id.* We review conclusions of law de novo. *Id.*

#### Issue One: Commercial Reasonableness of Sale

■ Moore contends that the evidence is insufficient to support the court's finding that CIT's sale of the Excavator was conducted in a commercially reasonable fashion. In support, he cites Indiana Code Section 26–1–9.1–610, which provides that "[e]very aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable." Ind.Code § 26–1–9.1–610(b). Wells Fargo counters that Moore "waived any challenge to the reasonableness of the actions taken by Wells Fargo in re-selling the Excavator which constituted its collateral." Appellee's Brief at 16. In support, Wells Fargo cites the Security Agreement and waiver language in the Guaranty. Thus, we must construe

Indiana Code Section 26–1–9.1–610 with the Security Agreement and Guaranty.

The standard for reviewing a contract on appeal is well established. In most cases, the intent of the parties to a contract is to be determined by the "four corners" of the contract. *Keithley's Auction Serv. v. Children of Jesse Wright*, 579 N.E.2d 657, 659 (Ind.Ct.App.1991). Where the language of an instrument is unambiguous, we give effect to the intentions of the parties as expressed in the four corners of the document. *Art Country Squire, L.L.C. v. Inland Mortgage Corp.*, 745 N.E.2d 885, 889 (Ind.Ct.App. 2001); *Orme v. Estate of Kruwell*, 453 N.E.2d 355, 356 (Ind.Ct.App.1983). Clear, plain, unambiguous terms are conclusive of that intent. *Art Country Squire*, 745 N.E.2d at 889. We will neither construe clear and unambiguous provisions nor add provisions not agreed upon by the parties. *Id.* The meaning of a contract is to be determined from an examination of all of its provisions, not from a consideration of individual words, phrases, or even paragraphs read alone. *Id.*

A separate release agreement is a species of contract that surrenders a claimant's right to prosecute a cause of action. *Dick Corp. v. Geiger*, 783 N.E.2d 368, 374 (Ind.Ct.App.2003) (construing mutual release and payment provisions in change order), *trans. denied; see also Zollman v. Geneva Leasing Assocs.*, 780 N.E.2d 387, 392 (Ind.Ct.App.2002). "Our supreme court has stated that upholding releases serves an important public policy because it facilitates the orderly settlement of disputes." *Dick Corp.*, 783 N.E.2d at 374. Interpretation of a release, like any other contract, is determined by the terms of the particular instrument, considered in light of all facts and circumstances. *Id.* Absent an ambiguity, release provisions are interpreted as a matter of law,

and we look only to the instrument to ascertain the parties' intent. *Id.*

Here, the Guaranty that Moore executed contains the following provision: "[e]ach of us waives . . . any and all defenses based on suretyship or any other applicable law, including without limitation all rights and defenses arising out of . . . the commercial reasonableness of [the] disposition or the impairment, however caused, of the value of [the Excavator.]" Exhibit 2 at 1. Moore does not contend that the Guaranty's waiver provision is ambiguous, nor does he maintain that he executed the Guaranty under economic duress, fraud, or mistake. And Moore does not contest the trial court's finding that the "Guaranty contains provisions including . . . [a] waiver of the guarantor basing a defense of liability on the commercial reasonableness of CIT's disposition of the collateral, or CIT's failure to notify of the disposition of collateral." Appellant's App. at 9. In fact, Moore does not address the waiver provision in his brief at all. Instead, he argues only that Indiana Code Section 26–1–9.1–610 requires all sales of collateral to be conducted in a commercially reasonable manner and that the instant sale did not meet that standard.

We agree with Moore that Section 26–1–9.1–610 requires sales such as the instant one to be commercially reasonable. But the plain language of the Guaranty shows that Moore intended to waive any claim regarding the commercial reasonableness of a sale of the Excavator. Thus, under the Guaranty, Moore has waived that claim.

### Issue Two: Notice of Sale

Moore also contends that CIT did not provide proper notice of the sale of the Excavator. As an initial matter, we note that the Guaranty contains a waiver of the failure to notify any guarantor of the dis-

position of the Excavator. But, under Indiana Code Section 26–1–9.1–624, a debtor or secondary obligor may waive the right to notification of the sale of collateral as defined by Indiana Code Section 26–1–9.1–611 only by a post-default authenticated agreement. Here, Moore signed the Guaranty before McCawith defaulted on its payments to CIT. Thus, the waiver of notice in the Guaranty is ineffective.

In support of its position on appeal, Moore cites to a 1984 opinion in which this court quoted and applied former Indiana Code Section 25–1–9–504(3). That statute set forth the requirements for a notice of the sale of collateral securing a defaulted debt. But Section 26–1–9–504 was repealed effective July 1, 2001. Currently, Indiana Code Sections 26–1–9.1–611 and – 613 govern the notification required before a secured creditor may sell collateral. Thus, we consider whether the Second Notice sent by CIT to Moore satisfies those statutes.[5]

Indiana Code Section 26–1–9.1–611 provides, in relevant part:

(a) As used in this section, "notification date" means the earlier of the date on which:

(1) a secured party sends to the debtor and any secondary obligor an authenticated notification of disposition; or

(2) the debtor and any secondary obligor waive the right to notification.

(b) Except as otherwise provided in subsection (d), a secured party that disposes of collateral under IC 26–1–9.1–610 shall send to the persons specified in subsection (c) a reasonable authenticated notification of disposition.

(c) *To comply with subsection (b), the secured party shall send an authenticated notification of disposition to:*

(1) *the debtor;* [and]

(2) *any secondary obligor . . . .*

(Emphases added). And Indiana Code Section 26–1–9.1–613 provides, in relevant part:

(1) The contents of a notification of disposition are sufficient if the notification:

(A) describes the debtor and the secured party;

(B) describes the collateral that is the subject of the intended disposition;

(C) states the method of intended disposition;

(D) states that the debtor is entitled to an accounting of the unpaid indebtedness and states the charge, if any, for an accounting; and

(E) *states the time and place of a public disposition* or the time after which any other disposition is to be made.

(2) Whether the contents of a notification that lacks any of the information specified in subdivision (1) are nevertheless sufficient is a question of fact.

(3) The contents of a notification providing substantially the information specified in subdivision (1) are sufficient, even if the notification includes:

(A) information not specified by that subdivision; or

(B) minor errors that are not seriously misleading.

(4) A particular phrasing of the notification is not required. . . .

---

**5.** Moore limits his argument to the adequacy of the Second Notice. He does not assert an argument regarding the adequacy of the First Notice.

Here, the lower court found that CIT issued the Second Notice to McCawith and Moore. That notice informed Moore that CIT intended to sell the Excavator through a public internet auction website on October 19, 2005. The court also found that CIT gave Moore notice of CIT's intention to resell the Excavator in mitigation of the McCawith debt and that CIT would hold Moore liable for any deficiency.

Moore does not contest these findings. Nevertheless, he argues that he "did not receive proper notice about the location for the sale of the [E]xcavator[.]" Appellant's Brief at 23. Specifically, Moore contends that CIT did not inform him of the physical location for the proposed sale of the Excavator through the internet auction website. But, aside from stating simply that a *physical* location is required when the sale is to be conducted through an internet auction, Moore does not support his argument with cogent reasoning and, therefore, he has waived it. *See* App. R. 46(A)(8)(a).

Nevertheless, again, the relevant statute provides that the notice shall state the "time and place of a public disposition." Ind.Code § 26–1–9.1–613. The Second Notice informed Moore that CIT intended to sell the Excavator in a public auction over the internet. The notice listed the date and web address for the auction and the physical address of the auction company. An internet auction has no physical location and is not a situs in the traditional sense. But the web address of the auction and the physical address of the auction company adequately apprised Moore where the auction would be held, allowing him to moni-

tor or even participate in the auction. Thus, we conclude that the Second Notice, containing the web address of the auction and the physical address of the auction company, satisfies the location requirement in Indiana Code Section 26–1–9.1–613(1)(E). As such, Moore's argument that the Second Notice was inadequate must fail.[6]

Affirmed.

FRIEDLANDER, J., and VAIDIK, J., concur.

---

6. Moore also asserts that, because the notice of sale was deficient, CIT " 'face[d] a rebuttable presumption that the reasonable value of the collateral at the time of the sale was equal to the amount of the debt.' " Appellant's Brief at 24 (quoting *Vanek v. Ind. Nat'l Bank,* 540 N.E.2d 81, 83 (Ind.Ct.App.1989), *aff'd,* 551 N.E.2d 1134 (Ind.1990)). Moore then argues that CIT failed to rebut that presumption. Because we determine that Moore has not demonstrated that the notice of sale was deficient, we need not reach his argument regarding the presumption.