Richard **MOORE,** Appellant–Defendant,

v.

**WELLS FARGO CONSTRUCTION,** Appellee–Plaintiff.

No. 84A04–0808–CV–477.

Court of Appeals of Indiana.

June 5, 2009.

---

Gary G. Hanner, Hanner, Hanner & Hanner, Rockville, IN, Attorney for Appellant.

John J. Petr, Kroger, Gardis & Regas, LLP, Indianapolis, IN, Attorney for Appellee.

## OPINION ON REHEARING

NAJAM, Judge.

■ Moore has filed a petition for rehearing, asking us to reconsider our holding that Moore waived the argument that CIT's sale of the Excavator was not conducted in a commercially reasonable manner. In particular, Moore argues that he was statutorily barred from waiving his right to a commercially reasonable sale of collateral.[1] Although Moore did not directly or indirectly make this argument in his Appellant's Brief, on review we agree with Moore that, under the Uniform Commercial Code, he could not have waived the right to a commercially reasonable sale of collateral. As such, we grant Moore's petition to consider whether CIT conducted the sale of the Excavator in a commercially reasonable manner. And, after considering that issue on the merits, we reaffirm the trial court's decision.

The relevant facts are as follows:

McCawith Energy, Inc. ("McCawith") was a mining corporation that operated a mine in Parke County, Indiana. George McGuire, Gerald Carr, Donald Wile, and Moore were principals of McCawith, though Moore had a minority interest. On June 14, 2000, McCawith refinanced a 1998 Liebherr R984B excavator ("the Excavator") through CIT for $557,918.28. In return for the refinancing, Moore and the other principals exe-

---

1. On rehearing, Moore cites to Indiana Code Section 26–1–9.1–602 in support of his argument that he could not have waived the right to a commercially reasonable sale. But that statute became effective July 1, 2001, more than one year after Moore signed the Security Agreement and guaranty at issue in this case. Thus, we consider Moore's argument under former Indiana Code Section 26–1–9–501, which was in effect when Moore and Wells Fargo executed the security agreement and the guaranty. Former Indiana Code Section 26–1–9–501(3) also provided that a debtor could not waive the right to a commercially reasonable sale of collateral.

cuted and delivered to CIT a security agreement and a personal guaranty for the indebtedness.

\* \* \*

Moore and the principals also executed a single personal guaranty ("the Guaranty") on the indebtedness. The Guaranty provides, in relevant part: "Each of us waives ... the failure to notify any of us of the disposition of any property securing the obligations of [McCawith and] the commercial reasonableness of such disposition or the impairment, however caused, of the value of such property...." Exhibit 2 at 1.[ ]

McCawith defaulted on the loan from CIT in 2003, and CIT took possession of the Excavator. McCawith then filed for bankruptcy, as did all of the principals of McCawith except Moore. CIT sent a Notice of Disposition of Collateral ("First Notice") to Moore and McCawith on December 2, 2003. The First Notice apprised Moore that CIT planned to "sell the Liebherr R984B S/N: 409–2002 and any and all attachments privately sometime after Tuesday, December 16, 2003. You are hereby put on notice that CIT Group, Inc. intends to pursue a deficiency action against you for any deficiency that might exist after the sale of the collateral." Exhibit 3 at 1.[ ] On October 5, 2005, CIT sent a second Notice of Disposition of Collateral ("Second Notice") to Moore. The Second Notice provides, in relevant part:

> We will sell the One (1) 1998 Liebherr model R984B Excavator a/n [sic] 409–2002 in public as follows:
>
> Day & Date: Wednesday, October 19, 2005
>
> Time *: 8 a[.]m[.] till sold
>
> Place: www.salvagesales.com

Salvage Sale, Inc.
1001   McKinney
Houston, TX 77002
(713) 286–4660

> You are hereby put on notice that CIT intends to pursue a deficiency action against you for any deficiency that might exist after the sale of the collateral.

Exhibit 4 at 1.[ ]

CIT was unable to sell the Excavator through the auction website. As a result, CIT again offered the equipment for sale privately. In January 2006, Bramer & Son of Louisville, Kentucky ("Bramer") offered to purchase the Excavator for $48,000. CIT counter-offered, and Bramer agreed to buy the Excavator for $54,000. After deducting $3434 for locating and making minimal repairs to the Excavator, CIT applied $50,566 to McCawith's indebtedness, leaving a balance of $251,696.39.

In June 2006, CIT filed a deficiency action against Moore. On August 2, 2007, Wells Fargo was substituted as the plaintiff and real party in interest. A bench trial was held on March 31, 2008, and on July 3, the court entered its findings of fact and conclusions thereon in favor of Wells Fargo ("Judgment"). *Moore v. Wells Fargo,* 903 N.E.2d 525, 526–28 (Ind.Ct.App.2009). The trial court awarded $354,800.40 plus court costs and statutory interest to Wells Fargo. *Id.* at 530.

On appeal, Moore argued in relevant part that the sale of the Excavator had not been conducted in a commercially reasonable manner.[2] We described the evaluation of the commercial reasonableness of the sale of collateral in *Walker v. McTa-*

---

**2.** In his brief on rehearing, Moore does not present any argument in support of his contention that the sale was not conducted in a commercially reasonable manner. Therefore, we consider the argument on that point as presented in his Appellant's Brief.

*gue,* 737 N.E.2d 404 (Ind.Ct.App.2000), *trans. denied.* There, the Walkers sold two eating and drinking establishments to McTague Properties NFT, Inc., under a conditional sales contract. The contract provided for sixty monthly payments and a final balloon payment. The McTagues, the owners of McTague properties, also signed a personal guaranty for the sums due under the contract and a separate commercial lease. When McTague Properties was unable to make payments, it executed a security agreement granting the Walkers a first priority security interest in "virtually all" of the assets of McTague Properties.

Shortly before the balloon payment became due, McTague Properties filed bankruptcy. In the bankruptcy case, the Walkers and McTague Properties entered into a stipulated relief from the automatic stay, which allowed the Walkers to take possession of and manage the establishments pending sale or auction. Although McTague Properties' bankruptcy petition was later dismissed, the Walkers remained in possession of and continued to operate the establishments. They then placed notices in the Lafayette and Indianapolis newspapers, advertising a sealed bid auction of business assets. The sole bidder was a limited liability company controlled by the Walkers.

After the sale, the Walkers filed suit against the McTagues on the guaranty, seeking the amount due under the contract, which was in excess of $250,000. The trial court entered judgment in favor of the Walkers for $7400. On appeal, we considered whether the trial court's findings were supported by the evidence and whether the judgment was supported by the findings. In so doing, we described the standard for determining the commercial reasonableness of a sale:

> [B]ecause the UCC does not give a specific definition of what constitutes a "commercially reasonable sale," the de-

termination as to whether or not a sale was reasonable will generally depend upon the circumstances of each particular case, and is a question of fact. The primary factor to be considered is the price received by the secured party. "In cases where a fair sale price was received, the debtor will have suffered no injury and normally will have no complaint.... In cases where a fair sale price was not received, the other items to be considered will generally be relevant to the extent that they may have prevented a fair price or contributed to an unfair price." Indiana Code [S]ection 26–1–9–507, however, makes it clear that the sale price is not the only item to be considered:

> The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner ... [.]

Ind.Code § 26–1–9–507(2). Thus, even though a low sale price itself is insufficient to overturn a sale, closer scrutiny will generally be given sales in which there is a substantial difference between the sale price and the fair value to determine whether there were legitimate causes for the low price or whether the low price was caused by the secured party's failure to proceed in a commercially reasonable manner.

Other factors to be considered in deciding whether a sale was commercially reasonable include: 1) whether the collateral is sold on a retail or wholesale market; 2) the number of bids received or solicited; and 3) that the time and place of the sale is reasonably calculated to bring a satisfactory turnout of bidders. In deciding whether or not the disposition of collateral was accomplished in a commercially reasonable

manner all of the relevant factors should be considered together. *Id.* at 410 (some citations omitted).

Applying that reasoning, we noted that the Walkers gave no notice of the sale of collateral to the McTagues, the only bid submitted in the closed bid process was from a company controlled by the Walkers, and the sale price was far less than the total value of the businesses or the amount of the debt secured by the businesses. As a result, we held that the trial court did not err in concluding that the sale was not conducted in a commercially reasonable manner. *Id.* at 411.

■ Here, Moore does not deny that he received notice of each attempt to sell the Excavator. Instead, he argues only that the sale was not conducted in a commercially reasonable manner. In particular, in his Appellant's Brief, Moore contends that the "evidence is without conflict that there was no adequate appraisal of the Liebherr, no true knowledge displayed in accurately valuing the Liebherr, no maintenance after it reached CIT, and inadequate efforts to market and advertise the Liebherr for sale." Appellant's Brief at 22. We cannot agree.

Because neither Moore nor McCawith notified CIT of the location of the Excavator after default, CIT hired a third party to locate the collateral. The Excavator was found in Parke County, in an inoperable state and without a key. CIT spent $3434 to locate the Excavator, to make it "minimally operational," and to move it to another location for later disassembly and transport. Transcript at 41.

Before advertising the Excavator for sale, CIT obtained an Inspection/Appraisal Form from Chicago Machinery Co. At the time it was repossessed, the Excavator had 19,800 hours, with 3500 hours on the engine, and required several repairs, including two new track chains, "a lot" of sheet metal repair, a rebuilt "bucket linkage,"

and replacement of the main hydraulic valve. Plaintiff's Exhibit 6 at 6. The cost of replacing just the main hydraulic valve was approximately $30,000.

The market for the Excavator was limited by the nature of the collateral. The Excavator weighed 247,000 to 253,000 pounds. To transport it would have required disassembly of the Excavator for shipping on four or five semi-trucks. The cost to disassemble and transport the Excavator to a new location was $20,000 to $28,000. And it would have cost more than $60,000 to ship the Excavator to Asia or Europe.

Given the cost to move the Excavator, the cost of the needed repairs, and CIT's policy of spending approximately $2000 for repairs and cleanup on each piece of recovered equipment, CIT decided to sell the Excavator "as is." CIT set the sale price after discussing pricing with a Liebherr dealer and after having obtained prices on similar Liebherr excavators through the Green Guide and Machinery Trader. After consulting these sources, CIT set the initial sale price at $125,000.

CIT first attempted to sell the Excavator through Richie Brothers Auctions in 2004, but that auction was cancelled by the auction company. CIT then attempted to sell the Excavator through private sales and received two purchase offers, one for $76,500 and another for $87,000. When CIT made counter-offers, in each case the original offerors did not respond. When the Excavator could not be sold in the private market, CIT listed the Excavator for sale with the Internet auction site Salvage Sale, Inc. No sale resulted from that listing either. For each attempted sale, CIT provided the required notice of sale to Moore.

Finally, in January 2006, Bramer and Son of Louisville, Kentucky, offered to

purchase the Excavator for $48,000.[3] CIT counter-offered, and Bramer agreed to a purchase price of $54,000. The trial court also admitted into evidence a summary of sales of similarly aged Liebherr R984 excavators. That summary showed that three Liebherr excavators were sold by auction in December 2008: for $45,608 in Brisbane, Australia; for $30,000 in Atlanta, Georgia; and $4,700 in Madisonville, Kentucky.[4]

In sum, the evidence shows that CIT conducted research before setting a price on the Excavator; investigated the condition of the Excavator, the cost of necessary repairs, and the cost of transporting it; performed the repairs necessary to make the Excavator minimally operational; and twice listed the Excavator for each public and private sale before finding a private buyer. CIT attempted to obtain more than the initial private offers on the Excavator but, when that was unsuccessful, finally sold the collateral for $54,000. In light of all the circumstances, we cannot say that the trial court abused its discretion when it determined that CIT's sale of the Excavator was conducted in a commercially reasonable manner. In all other respects, we affirm our prior opinion.

Rehearing granted, modified in part and reaffirmed in part.

FRIEDLANDER, J., and VAIDIK, J., concur.

---

3. On appeal, Moore challenged the notice of sale from CIT only with regard to the location of sale through the Internet auction website.

4. The summary does not disclose the condition of these excavators.