In the

# United States Court of Appeals

### For the Seventh Circuit

No. 10-3903

LADY DI'S, INC.,

*Plaintiff-Appellant*,

*v.*

ENHANCED SERVICES BILLING, INC. AND
ILD TELECOMMUNICATIONS, INC. d/b/a
ILD TELESERVICES, INC.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:09-cv-00340-SEB-DML—**Sarah Evans Barker**, *Judge*.

ARGUED MAY 11, 2011—DECIDED AUGUST 16, 2011

Before ROVNER and HAMILTON, *Circuit Judges*, and
LEFKOW, *District Judge.**

HAMILTON, *Circuit Judge.* Plaintiff Lady Di's, Inc. alleged
in this proposed class action that defendants Enhanced

---

* The Honorable Joan Humphrey Lefkow of the Northern
District of Illinois, sitting by designation.

Services Billing, Inc. ("ESBI") and ILD Telecommunications, Inc. are billing aggregators engaged in "cramming" by placing unauthorized charges on customers' telephone bills. The plaintiff alleged that the defendants arranged to have unauthorized charges placed on its telephone bill and, in the six years before this suit was filed, have been responsible for unauthorized charges being placed on the telephone bills of more than one million Indiana telephone numbers. The complaint alleged that plaintiff "never requested, authorized, or even knew about" the services for which defendants charged it. The evidence, however, turned out differently. Both defendants produced evidence proving that the plaintiff actually ordered the services in question.

Despite that evidence, plaintiff has pursued the case, arguing that although it actually ordered the services, the charges were never properly authorized. The plaintiff's case now hinges on its theory that, even if a customer has actually ordered and benefitted from a service, the service was not legally authorized if the defendants did not possess all the customer authorization documentation required by the Indiana anti-cramming regulation, 170 IAC § 7-1.1-19(p). Indiana's anti-cramming regulation does not provide a private right of action, but the plaintiff argues that the defendants' failure to comply proves, without more, common law unjust enrichment, so that potential class members are entitled to a refund for all services for which defendants charged them. The plaintiff also argues that the defendants' failure to comply with the regulation proves a claim for damages under Indiana's Deceptive Commercial Solicitation Act, Ind. Code § 24-5-19-9.

The district court denied the plaintiff's request for class certification and granted the defendants' motions for summary judgment on the unjust enrichment and statutory deception claims. *Lady Di's, Inc. v. Enhanced Services Billing, Inc.*, 2010 WL 4751659 (S.D. Ind. Nov. 16, 2010). We affirm the district court's judgment, though we follow a somewhat different path to that end. Turning first to the merits, we conclude that the Indiana anti-cramming regulation does not apply to these defendants because they are not telephone companies and did not act in this case as billing agents for telephone companies. Second, we find that there was no unjust enrichment where the plaintiff ordered and received the services in question. Third, we find that the Deceptive Commercial Solicitation Act does not apply because the plaintiff had actually ordered the services for which it was charged. Finally, because we reject plaintiff's theory of the case, premised solely on the defendants' common violation of the Indiana anti-cramming regulation, we affirm the district court's denial of class certification because common issues do not predominate over individual issues, as required for a class under Federal Rule of Civil Procedure 23(b)(3).

I. *Factual and Procedural Background*

A. *The Parties*

Plaintiff Lady Di's is a small business incorporated in Indiana, where it also has its principal place of business. Lady Di's uses AT&T as its telephone company. Dianne

Markin-Venn is the president and owner of Lady Di's and personally reviews and pays the company's telephone bill. Defendant ESBI is incorporated in Delaware with its principal place of business in Texas. Defendant ILD is incorporated in Delaware with its principal place of business in Florida. Both defendants are "billing clearing-houses" or "billing aggregators." As billing aggregators, ESBI and ILD are not directly involved with the sale of telecommunications and related services to customers. Instead, they act as intermediaries between telephone companies and service providers.

The term "service providers" refers to a wide variety of vendors, including long distance providers, internet and web-hosting companies, directory assistance operators, and voice mail providers. There are hundreds of service providers throughout the country. They sell telecommunications and related services (and sometimes unrelated services) to customers and then use billing aggregators to transmit charges to telephone companies to be included in customers' bills. The charges from service providers aggregated by these defendants appear on customers' local telephone bills on pages labeled "ESBI" or "ILD." After customers pay their telephone bills, ESBI and ILD collect payments for service provider charges recovered by local telephone companies, deduct part of the payment as a fee, and forward the rest on to the service providers.

B.  *Allegations of Unauthorized Charges on the Plaintiff's Telephone Bill*

The plaintiff contends that for several months in 2008, defendants ESBI and ILD each placed unauthorized charges on its telephone bill. ILD placed a monthly charge of $49.95 from the service provider "Advanced Business Services, LLC," an e-fax service, on the plaintiff's AT&T telephone bill. The charge was labeled "ADVANCED BUS. SVCS, LLC-EFAX SVC MTHLY." Dkt. 125, Ex. C1-C2. Defendant ESBI placed a monthly charge of $42.75 from "My Local Reach, Inc.," a company that registers customer websites with Internet search engines and directories, on plaintiff's bill. The charge was labeled "MYLOCALREACH-ONLINE YP LISTING MTH FEE." *Id*. On plaintiff's telephone bills, all of these charges were marked on both the front cover sheet and on pages within the bills marked "ESBI" and "ILD." *Id.*

The complaint alleged that the plaintiff paid its October 2008 telephone bill before it discovered the ESBI and ILD charges, but plaintiff's owner testified that she questioned the October charges before paying the bill. The plaintiff eventually paid the charges but later requested a refund. The plaintiff first contacted AT&T for a refund and was told to contact ESBI and ILD. ESBI refused to refund the charges. ILD never returned its call. The plaintiff then turned the matter over to its attorneys. After this lawsuit was filed, the plaintiff's account was credited in full (minus $14.00 in sales tax) for the disputed charges: $199.75 for the My Local Reach/ESBI charges and $299.70 for the Advanced/ILD charges. Dkt.

125, Ex. C3-C4; Dkt. 139, Ex. A, ¶ 11 (Decl. of Kathy McQuade); Dkt. 139, Ex. B, at 67 (Markin-Venn Dep.); Dkt. 86, Ex. C, at 95-96 (Markin-Venn Dep.).[1]

"Cramming" means placing unauthorized charges on telephone bills, but the defendants have produced evidence showing that the plaintiff actually ordered the disputed services for which it was billed. ESBI produced a recorded conversation between a sales representative of service provider My Local Reach and plaintiff's owner Markin-Venn, who orally authorized My Local Reach to bill Lady Di's on its local telephone bill $39.95 per month. See Dkt. 84, at 6-8 (transcript of July 15, 2008 conversation). Likewise, ILD produced a recorded conversation between service provider Advanced's third party verification service and Lady Di's. In that conversation, a representative of Lady Di's (who claimed to be Markin-Venn) agreed to be billed for Advanced's services. See Dkt. 90, Ex. B, at 29-30 (Markin-Venn Dep.); see also *id.*, Ex. C, at 7-8 (transcript of May 6, 2008 conversation). This evidence of oral authorization is undisputed.

C. *Procedural History*

The plaintiff first filed suit and moved for class certification in state court. The defendants then removed the

---

[1] The plaintiff argues that these were not full refunds because they did not include taxes or interest. We do not reach this issue because we conclude that defendants would be entitled to summary judgment even if they had not made the refunds.

case to the Southern District of Indiana. The district court granted ILD's motion to dismiss the plaintiff's constructive fraud claim but denied ILD's motion to dismiss the claims for unjust enrichment and statutory deception. After discovery, the district court denied the plaintiff's motion for class certification and granted defendants' motions for summary judgment on the remaining claims for unjust enrichment and statutory deception. The plaintiff appeals both rulings.

II. *Analysis*

  A. *The Merits*

Because the plaintiff's legal theory affects whether common or individual issues predominate and thus whether the class may be certified under Federal Rule of Civil Procedure 23(b)(3), we first address the merits of the unjust enrichment and statutory deception claims before turning to the class certification issue. We review the district court's summary judgment decisions de novo, viewing all facts in the light most favorable to the non-moving party. *Trask-Morton v. Motel 6 Operating L.P.*, 534 F.3d 672, 677 (7th Cir. 2008). Summary judgment is appropriate only where the moving parties show that there is no genuine issue of material fact. Fed. R. Civ. P. 56(a). The moving parties bear the initial burden of demonstrating that these requirements have been met. They may meet this responsibility by showing that there is an absence of evidence to support the non-moving party's case if that party bears the burden of proof. *Trask-Morton*, 534 F.3d at 677.

1. *The Indiana "Cramming" Regulation*

The plaintiff builds its case on a regulation issued by the Indiana Utility Regulatory Commission that was designed to counter the widespread consumer fraud practice known as "cramming." Cramming, as described by the Federal Communications Commission, is the practice of "placing unauthorized, misleading, or deceptive charges" on a telephone bill. See Dkt. 5, Ex. A, at 30 ("Unauthorized, Misleading, or Deceptive Charges Placed on Your Telephone Bill — 'Cramming,'" Federal Communications Commission (July 1, 2008) ("FCC cramming brochure")). The practice of cramming emerged after the court-ordered break-up of AT&T. See, *e.g.*, *F.T.C. v. Inc21.com Corp.*, 688 F. Supp. 2d 927, 929 (N.D. Cal. 2010). AT&T divested its local telephone services to independent regional companies. After the divestiture, one company provided a customer's local telephone services and another company provided long-distance telephone services, but the regional telephone companies continued the practice of providing consumers with a single telephone bill. The Federal Communications Commission later removed billing and collection services provided by local telephone companies from regulated tariff rates. In the 1990s, an industry emerged of service providers eager to place charges on customers' local telephone bills; "the types of charges that [now] appear on local telephone bills . . . encompass far more than long-distance services and can have almost nothing to do with phone services." *Id*; see also *Unauthorized Charges on Telephone Bills*, Staff Report, Senate Com-

mittee on Commerce, Science, and Transportation (July 12, 2011).

According to the FCC, "Crammers rely on confusing telephone bills in an attempt to trick consumers into paying for services they did not authorize or receive, or that cost more than the consumer was led to believe." Dkt. 5, Ex. A, at 30 (FCC cramming brochure). Cramming comes in a variety of forms, including small fees with generic sounding descriptions like "service charges," intended to trick unwary telephone customers into paying small extra monthly fees. These methods are often effective—in a survey cited in a recent case in California, nearly 97% of one crammer's "customers" had not agreed to the services for which they were charged, while only 5% of those customers even noticed that they had been billed. *F.T.C. v. Inc21.com Corp.*, 745 F. Supp. 2d 975, 982 (N.D. Cal. 2010). An FCC brochure encourages consumers to be vigilant in examining their telephone bills to detect possible cramming, and warns: "If a local telephone company, long distance telephone company, or another type of service provider either accidentally or intentionally places unauthorized, misleading, or deceptive charges on your bill, you may have been 'crammed.'" Dkt. 5, Ex. A, at 30 (FCC cramming brochure).

In 1998, the Indiana General Assembly responded to cramming by enacting Indiana Code § 8-1-29-5(2), which provides:

> A customer of a telecommunications provider may not be . . . billed for services by a telecommunications provider that without the customer's authori-

zation added the services to the customer's service order.

Pursuant to its authority to implement the statute, the Indiana Utility Regulatory Commission promulgated 170 IAC § 7-1.1-19, on which the plaintiff's theory rests. In particular, section 19(p) lists five kinds of documentation that certain types of telecommunications providers must have in their possession before they charge their customers. The regulation, which requires a little translation from "telephonese," provides in relevant part:

> (p) Except for tariff-regulated, customer-initiated, one-time use products, such as collect calling services, optional pay-per-use services (including automatic callback, repeat dialing, and three-way calling), no PIC or LEC or any billing agent acting for said PIC or LEC shall bill a customer for any service unless the PIC, LEC, or billing agent possesses written or electronic documentation that shows:
>
> > (1)  the name of the customer requesting the service;
> >
> > (2)  a description of the service requested by the customer;
> >
> > (3)  the date on which the customer requested the service;
> >
> > (4)  the means by which the customer requested the service; and
> >
> > (5)  the name, address, and telephone number of all sales agents involved.

(q) No PIC, LEC, or billing agent for any PIC or LEC shall be entitled to any compensation from a customer for services rendered in violation of this rule.

170 IAC § 7-1.1-19.[2]

The plaintiff argues that the defendants are billing agents for PICs and LECs and violated the regulation by failing to have in their possession all five forms of required documentation. From this premise, plaintiff argues that these defendants could never have had proper authorization from the plaintiff, even if the plaintiff orally agreed to be charged for services. Because the case comes to us on appeal from a grant of summary judgment, we assume that the defendants did not actually possess all five forms of documentation listed in the regulation.

The anti-cramming regulation does not provide a private cause of action, although 170 IAC § 7-1.1-19(q)

---

[2] To translate, a PIC or primary interexchange carrier is a "provider of presubscribed inter-LATA or intra-LATA long distance telecommunications services. The term includes the following: (A) Presubscribed facilities-based carriers of long distance service. (B) Resellers of long distance service. (C) Local exchange carriers providing long distance service." 170 IAC § 7-1.1-19(a). ("Inter-LATA" refers to communications between two Local Access and Transport Areas, and "intra-LATA" refers to communications within one LATA.) A LEC or local exchange carrier is a "provider of switched telecommunications service that carries calls originating and terminating within the local calling area." *Id*.

provides a defense to a collection action: "No PIC, LEC, or billing agent for any PIC or LEC shall be entitled to any compensation from a customer for services rendered in violation of this rule." The plaintiff seeks to overcome this lack of a statutory or regulatory cause of action with two different claims: (a) a common law unjust enrichment claim, and (b) a claim under the Deceptive Commercial Solicitation Act.

There are three fatal problems with the plaintiff's claims that lead us to affirm summary judgment for the defendants. First, the regulation simply does not apply to these defendants in this case. They are not PICs or LECs, and they did not act here as billing agents for a PIC or a LEC. That is a problem for both of plaintiff's theories. Second, even if the regulation applied, there was no unjust enrichment because the plaintiff orally ordered and received the benefit of the services for which it paid. Third, and again even if the regulation applied, there was no violation of the Indiana Deceptive Commercial Solicitation Act. The relevant portion of the statute does not apply to services that were "ordered," as the services were in this case. We discuss these issues in turn.

2. *Scope of the Regulation*

The crux of the plaintiff's proposed class action is that a violation of the anti-cramming regulation, without more, proves both unjust enrichment and a violation of the Deceptive Commercial Solicitation Act. We conclude, however, that the plaintiff has not shown that the

defendants are actually bound by the anti-cramming regulation. The regulation does not apply to these defendants in this case because they are not PICs or LECs, and because they did not act as billing agents for a PIC or a LEC.

Lady Di's insists that the defendants are "billing agents" and bound by the anti-cramming regulation, but it provides little rationale for its assumption other than pointing to the defendants' contracts with another LEC (Verizon), in which the defendants supposedly represented that they were "billing agents." See Dkt. 126, Ex. 3, at 7 (ESBI/Verizon contract); Dkt. 128, Ex. 2, at 7 (ILD/ Verizon contract). The contracts with Verizon state that "each Carrier" (including ESBI and ILD) "represents and warrants that it has obtained all required authorizations under Applicable Law to conduct business as a Telecommunications Services provider or billing agent in each Verizon Billing Region in which Carrier has requested that Verizon provide Billing Services." The contract language does not indicate that the defendants said they would act as billing agents *for Verizon*. They are instead billing agents *for the service providers*. And the defendants' contracts with AT&T make it crystal clear that the defendants are AT&T's customers, not its agents. See Dkt. 142, Ex. 1, at 166 (ESBI/AT&T contract).

The anti-cramming regulation is not written to apply the documentation requirements to "billing aggregators." It provides that "no PIC, LEC, or billing agent for any PIC or LEC shall be entitled to any compensation. . . ." 170 IAC § 7-1.1-19(q). These defendants do not fall within

that language. They certainly are not PICs or LECs. They do not provide local switched telecommunications services or long-distance telecommunications services. They also did not act here as billing agents for a PIC or a LEC. An agent is a person authorized by another, the principal, to act for him or in his place. *Department of Treasury v. Ice Service*, 41 N.E.2d 201, 203 (Ind. 1942); see also *Oil Supply Co., Inc. v. Hires Parts Service, Inc.*, 726 N.E.2d 246, 248 (Ind. 2000) (noting that "[a]n agent is one who acts on behalf of some person, with that person's consent and subject to that person's control"). The undisputed facts show that the defendants in this case were not billing agents for a PIC or a LEC because (1) they were not authorized by a PIC or a LEC to act for it, (2) they were not entrusted with the business of a PIC or a LEC, and (3) they were not retained by a PIC or a LEC to provide services. Instead, the LEC charged these defendants a fee for billing and collecting money from its customers on behalf of these defendants and their service providers. (While service providers could perhaps include companies that also fit the definition of a PIC or a LEC, see *Micronet, Inc. v. Indiana Utility Regulatory Comm'n*, 866 N.E.2d 278, 294-95 (Ind. App. 2007), there is no evidence that any of the service providers here were PICs or LECs.)

The Indiana Utility Regulatory Commission anti-cramming regulation puts the burden to comply on the entities that it regulates directly, the PICs and LECs, plus their agents. Where a billing aggregator is not acting as an agent for a PIC or a LEC, nothing in the regulation as it is currently written requires these billing aggregators to

comply with the authorization documentation require-
ments in 170 IAC § 7-1.1-19(p).[3]


### 3. *Unjust Enrichment*

Even if the Indiana regulation applied to these defen-
dants, they would still be entitled to summary judgment
on plaintiff's unjust enrichment claim. Unjust enrich-
ment is an equitable doctrine wherein a person who has
been "unjustly enriched at the expense of another is
required to make restitution to the other." Restatement
of Restitution § 1 (1937), cited in *Bayh v. Sonnenburg*, 573
N.E.2d 398, 408 (Ind. 1991). "Unjust enrichment is also
referred to as quantum meruit, contract implied-in-law,
constructive contract, or quasi-contract." *Coppolillo v.
Cort*, 947 N.E.2d 994, 997 (Ind. App. 2011). It allows
for recovery "where the circumstances are such that
under the law of natural and immutable justice there
should be a recovery." *Id.*, quoting *Zoeller v. E. Chicago
Second Century, Inc.*, 904 N.E.2d 213, 220 (Ind. 2009). To
prevail on an unjust enrichment claim under Indiana
law, "a plaintiff must establish that a measurable benefit
has been conferred on the defendant under such circum-

---

[3] The LECs and PICs who contract with billing aggregators
need to ensure their own compliance, of course, and one way
to do so is through contracts with their own customers (the
billing aggregators and service providers) that require them to
provide the LECs and PICs with the required documentation.
Those contractual arrangements, however, do not subject the
billing aggregators directly to the regulation itself.

stances that the defendant's retention of the benefit without payment would be unjust." *Bayh*, 573 N.E.2d at 408; accord, *Creative Demos, Inc. v. Wal-Mart Stores, Inc.*, 142 F.3d 367, 372 (7th Cir. 1998), quoting *Wright v. Pennamped*, 657 N.E.2d 1223, 1229-30 (Ind. App. 1995).

There is simply nothing inequitable or unjust about the plaintiff paying for services it ordered and received. To counter this common-sense conclusion, plaintiff relies on the language of the anti-cramming regulation, which provides that a billing agent is not "entitled to any compensation from a customer for services rendered in violation of this rule." 170 IAC § 7-1.1-19(q). The plaintiff argues that this provision means that a billing agent who violates the regulation and collects money cannot justly keep any of the payment for services actually ordered and rendered. We disagree. The plaintiff's theory of unjust enrichment cannot be reconciled with the way Indiana courts understand it, as a doctrine to "promote justice and equity." *Wright*, 657 N.E.2d at 1229. We do not believe the Indiana courts would use the equitable doctrine of unjust enrichment to convert a technical violation of a regulation into a right of action that would produce a (tiny) windfall for an individual customer who actually ordered, received the benefit of, and paid for the services in question.

Relying primarily on two cases, however, the plaintiff argues that Indiana courts would allow a customer to recover payments made to a service provider if the charges were legally prohibited. See *Lawson v. First Union Mortgage Co.*, 786 N.E.2d 279 (Ind. App. 2003);

*Michener v. Watts*, 96 N.E. 127 (Ind. 1911). We are not persuaded. *Lawson* and *Michener* are readily distinguishable.

The plaintiff in *Michener* sought complete rescission of the contract, which is not possible here. In *Michener*, a vendee paid a vendor $300 cash for a patent right, with the understanding that the vendor had complied with laws governing the sale of patents. When the vendee realized that the vendor had not complied with the law, he sought to rescind the contract and tendered the vendor a reassignment of the patent right in exchange for repayment of the $300. The Indiana Supreme Court found that the vendee was entitled to relief: where "a contract is prohibited by a positive statute, enacted to protect the vendee as against the vendor . . . the parties have been held not to be in pari delicto, and the person for whose protection the statute was enacted has been permitted to recover the money or property parted with by him." *Michener*, 96 N.E. at 127. Unlike the situation in *Michener*, however, Lady Di's cannot return the services it has received and from which it has already benefitted.

In *Lawson*, the plaintiff filed an equitable claim for money had and received stemming from a mortgage financing. The trial court dismissed the complaint for failure to state a claim for relief, and the Indiana Court of Appeals reversed. Lawson alleged that the defendant mortgage company unlawfully charged a documentation fee for his mortgage. The appellate court found that the mortgage company could not "use

a prohibited provision" of a contract — in that case, the provision that called for a documentation fee — to "preclude recovery under an equitable claim." *Lawson*, 786 N.E.2d at 284. While the court reversed the dismissal for failure to state a claim upon which relief could be granted, it made clear that if the defendant could show a legitimate reason for charging the documentation fee, equity would not require the return of the money. *Id*. at 285. The undisputed facts here show that there was indeed a legitimate reason for charging the fees: plaintiff ordered and received the services.

If Indiana wants to create a private right of action for a violation of the anti-cramming law, it can do so by statute, or perhaps by regulation. It has not done so yet. If a customer is a victim of genuine cramming — charged for unwanted services that were not ordered — the equitable doctrine of unjust enrichment might well be applicable. But the doctrine of unjust enrichment cannot be used in this way by a customer like plaintiff, who actually ordered and received the services.[4]

4. *Statutory Deception*

We next turn to the plaintiff's argument that the defendants made false representations in order to collect pay-

---

[4] The district court found that there was no unjust enrichment because the plaintiff had been reimbursed in full for the charges it paid. That is also true, but we view the problems with plaintiff's claim as even more fundamental, not depending on the refunds.

ments to which they were not entitled under Indiana law. Under the Deceptive Commercial Solicitation Act:

> A person may not, with intent to deceive, knowingly or intentionally send, deliver, or transmit a bill, an invoice, or a statement of account due, or a writing that could reasonably be interpreted as a bill, an invoice, or a statement of account due, to solicit payment of money by another person for *goods not yet ordered or for services not yet performed and not yet ordered*.

Ind. Code § 24-5-19-3 (emphasis added). The plain language of the statute — applying only where a customer is billed for services "not yet ordered" — shows that it does not apply here, where the plaintiff in fact ordered the services for which it was charged. That is exactly what the plaintiff did in orally requesting and agreeing to pay for services from Advanced and My Local Reach.

The plaintiff argues that because the defendants did not comply with the anti-cramming regulation, the plaintiff could not have "legally ordered" the services because "any agreement to purchase the service [was] rendered void by ESBI's and ILD's failure to comply with the anti-cramming law." Pl. Br. at 24. To support this argument, the plaintiff relies on Indiana decisions saying that "[a] contract made in violation of a statute is void." *Continental Basketball Ass'n, Inc. v. Ellenstein Enterprises, Inc.*, 640 N.E.2d 705, 711 (Ind. App. 1994), *rev'd in part*, 669 N.E.2d 134, 139-41 (Ind. 1996); see also *Faust v. Design Consultants, Inc.*, 542 N.E.2d 1383, 1384 (Ind. App. 1989) ("When a statute fixes certain requirements as conditions precedent to the right to carry on a particular business, noncompliance with the statute renders void any con-

tracts made in carrying on the business, even if the statute contains no provisions to that effect."). We must assume the defendants failed to comply with the anti-cramming regulation, but we do not find this argument convincing for two reasons. First, if a contract is deemed "void," it would be unusual to allow one party to the void contract thereby to have a court order the other party to restore the consideration paid on one side without a similar restoration of consideration by the plaintiff. Second, and perhaps more simply, even if the agreement is void and thus unenforceable, the plaintiff still "ordered" services from My Local Reach and Advanced, so the statute that provides the cause of action does not apply.

By way of further explanation, first, plaintiff's voidness theory is highly unusual. When a court says that a contract is void, it usually means that the entire agreement, such as an illegal gambling contract, is not enforceable in court by either party. *E.g.*, 1 Richard A. Lord, Williston on Contracts § 1:20 (4th ed. 2007 & Supp. 2011). The courts simply leave the parties where they find them, providing relief to neither side. That is how the Indiana Supreme Court used the term, for example, in *Continental Basketball Ass'n, Inc. v. Ellenstein Enterprises, Inc.*, 669 N.E.2d 134 (Ind. 1996). The issue was whether a franchise contract should be enforced despite several violations of state franchise statutes. The court held that the franchise contract was not void, despite the violations, and understood the issue as whether the party who had violated the statutes could obtain relief from the other party despite statutory violations. *Id*. at 139-41; accord, *Straub v. B.M.T.*,

645 N.E.2d 597 (Ind. 1994) (holding that preconception agreement purporting to absolve father of liability for support of child was void and thus unenforceable); see also *Shelley v. Kraemer*, 334 U.S. 1 (1948) (holding that racial restrictive covenants were void as unconstitutional and thus unenforceable). This understanding of voidness distinguishes this case from the cases plaintiff cites and other similar cases.[5] Plaintiff has not offered a persuasive reason to think that the Indiana courts would take the unusual step of first holding a contract void because of a statutory violation and then awarding damages to one party to the contract, who could retain the entire benefit of the completed bargain.

Second, we must return to the statute in question, the Deceptive Commercial Solicitation Act, which can apply when a person is billed for services she did not order. Plaintiff seeks relief under that statute, not under a common law theory based on a supposedly void contract. Even if the agreements in question are void, the plaintiff still "ordered" the services. The defendants did not violate the statute that provides the right of

---

[5]  See, *e.g.*, *Mullikin v. Davis*, 53 Ind. 206 (Ind. 1876) (where liquor was sold illegally, seller could not recover damages from buyer for purchase price); *First Federal Savings Bank of Indiana v. Galvin*, 616 N.E.2d 1048, 1052 (Ind. App. 1993) (considering whether plaintiff could recover commission for finding buyer of real estate despite lack of broker's license); *Hoffman v. Dunn*, 496 N.E.2d 818 (Ind. App. 1986) (where plaintiff was not licensed real estate broker, contract was void and plaintiff could not recover damages).

action, so they were entitled to summary judgment on the claim under that statute.[6]

B. *Class Certification*

We turn finally to the class certification issue. Plaintiff sought to represent two plaintiff classes, one for each defendant's customers, under Federal Rule of Civil Procedure 23(b)(3), which requires, among other elements, that common issues of fact or law must predominate over individual issues. The district court found that the proposed classes failed this requirement of Rule 23(b)(3) because the details of each customer's individual transactions would need to be examined to consider whether the claims for unjust enrichment or statutory deception were proven. Plaintiff's arguments against this conclusion essentially mirror its arguments against the grant of summary judgment. Because a showing of a violation of the anti-cramming regulation, without more, would not prove either unjust enrichment or statutory deception, however, we agree with the district court that common issues would not predominate. See also *Brown v. SBC Communications, Inc.*, 2009 WL 260770, at *3 (S.D. Ill. Feb. 4, 2009) (denying class certification in nearly identical case for same reason). We affirm the denial of class certification.

---

[6] Because we affirm the district court's decision to grant the defendants' motions for summary judgment as to all of the disputed transactions, we need not address the voluntary payment doctrine.

The judgment of the district court is AFFIRMED.